THE PEOPLE, *ex rel.* Alexander S. Starkweather, *vs.* Major
E. L. GAUL.

The act of congress, of March 3, 1863, authorizing a suspension of the writ
of *habeas corpus*, was obviously aimed at "state or political prisoners," and
was designed to enable the president to arrest, and detain as prisoners,
persons charged with, or suspected of, some offense against the govern-
ment—persons deemed dangerous to the government—and to suspend the
privilege of the writ of *habeas corpus* as to all such persons. But the stat-
ute had no reference to enlisted soldiers of our army not accused of any
crime; and was not designed to prevent their discharge, on *habeas corpus*,
if illegally held as soldiers.

A WRIT of *habeas corpus* was issued herein to the defend-
ant, to produce the body of Samuel Starkweather, the
son of the relator, alleged to be detained improperly by the
defendant. It appeared that the son was under seventeen
years of age, and had been fraudulently enlisted. The de-
fendant retured to the writ that he held said Samuel as a
prisoner as an enlisted man in the United States army; that
he was the officer in command at the barracks in which young
Starkweather is restrained; that he held him as a prisoner in
no other manner than as an enlisted man, and he refused to
produce the body under the general order promulgating the
president's proclamation suspending the writ of *habeas corpus*.

A motion was then made that the defendant produce the
said Samuel, or that an attachment issue against him.

*J. M. Kimball* and *W. H. Peckham,* for the relator.

PECKHAM, J. The chief question presented here is, whether
the act of congress authorized the president to issue his proc-
lamation suspending the privilege of the writ of *habeas cor-
pus* in cases of this character.

The proclamation is based upon the act. It recites the
act, and assumes to speak under its authority. When this
act was passed, (March 3, 1863,) it had been adjudged by the
chief justice of the supreme court of the United States that
the president had no authority of himself to suspend the

privilege of this writ. The attorney general, I am aware, has given a contrary opinion. Courts, however, are guided by judicial rather than by other official opinions. Congress also seemed to have coincided with the chief justice, and, recognizing the necessity of passing a law to that end, have substantially defined when and where the privilege of this writ, so vital to personal liberty, may be suspended.

In what cases, then, may it be suspended under that act? Looking at the first sentence of the first section of that act, and at that alone, it would seem as if it might be suspended "in any case." The language is, "that during the present rebellion, the president of the United States, whenever in his judgment the public safety may require it, is authorized to suspend the writ of *habeas corpus* in any case throughout the United States, or any part thereof." Yet there are confessedly many cases where it can not be suspended under the act. Among others, are cases of prisoners confined by state authority for the alleged violation of state laws. Such are cases of ordinary misdemeanors or felonies. It would be difficult, if not impossible, to conceive that granting the writ in cases like the one before alluded to could have any influence upon or relation to "the public safety."

But if there were any doubt as to the power conferred by this act upon the president to suspend in the cases before alluded to, that doubt is wholly removed by the remaining part of the first section and by the second and third sections of the bill. The second clause of the first section provides, that "whenever and wherever the said privilege shall be suspended as aforesaid, no military or other officer shall be compelled, in answer to any writ of *habeas corpus*, to return the body of any person detained by him by authority of the president, but upon the certificate, under oath, of the officer having charge of any one so detained, that such person is detained by him as a prisoner under authority of the president, further proceedings under the writ shall be suspended," &c. As no such return could be made in the cases herein men-

tioned (of prisoners confined by state authority) as that above provided for, I think I may say it is clear beyond cavil that congress by this act did not confer and did not assume to confer upon the president power to suspend the privilege of this writ in all cases.

The question recurs, does the act confer upon him the power to suspend the privilege in the case under consideration? The first section of this act relates to the suspension of the writ, and to the return that shall be made thereto, that the "person is detained by him as a prisoner under authority of the president." The fifth and sixth sections regulate judicial proceedings in certain cases, and the fourth and seventh do not to touch this question. The second section directs the secretaries of state and war to furnish to the United States courts a list of "all persons, citizens of states in which the administration of the laws has continued unimpaired in the said federal courts, who now are, or may hereafter be, held as prisoners of the United States, by order or by authority of the president of the United States, or either of said secretaries, in any fort, arsenal or other place, as state or political prisoners, or otherwise than as prisoners of war." "The secretary of state to furnish a list of such persons as are imprisoned by the order or authority of the president, acting through the state department," and the secretary of war a list of such as are imprisoned by like order, acting through the department of war, "and in all cases where a grand jury, having attended any of said courts having jurisdiction in the premises, after the passage of this act, and after the furnishing of said list as aforesaid, has terminated its session without finding an indictment or presentment, or other proceeding, against such person," it is made the duty of the judges named in the act forthwith to order the person so imprisoned to be brought before them to be discharged, and it imposes a penalty of not less that $500, and not less than six months' imprisonment, upon every officer of the United States, who shall refuse to obey such order. But the court, before dis-

charging such person, shall require him to take an oath of allegiance, &c. and may, and in certain cases must, require a recognizance from such person to keep the peace toward the United States and its citizens, &c.    The third section makes further provision for the discharge of such persons from imprisonment in case the secretaries neglect to furnish said lists.

It will thus be seen that the first section provides for a return under oath by a military or other officer to the writ of *habeas corpus* in all cases where the privilege is suspended, "that such person is detained by him as a prisoner, under authority of the president." This is to be sworn to and must be true, as the act does not intend to require any officer to commit perjury. The persons as to whom the privilege of the writ is suspended must then be "detained as a prisoner, under authority of the president."

The question naturally suggests itself to the mind, could congress have intended to refer to our brave and honored soldiers as "prisoners" detained under authority of the president? We should not ordinarily regard them as prisoners, nor as detained by authority of the president, but as held to certain service under the act of congress under which they either enlisted or were drafted.

But the second section shows distinctly that the persons thus held as prisoners by order of the president, and as to whom the privilege of the writ was suspended, were persons charged with some offense committed, or intended to be committed, against the United States. Hence, expressly providing that after a grand jury, having had an opportunity to pass upon the case, had "terminated its session without finding an indictment or presentment, or other proceeding against such person," then in "all cases they should be discharged." It is seen how broad is the provision as to offenses. They were to be discharged unless the grand jury found "an indictment, presentment or other proceeding."

Is it not plain, then, that these provisions, which expressly include all persons held as prisoners under the authority of

the president, whether "as state or political prisoners, or otherwise," have no reference, and can have none, to the soldiers enlisted in the army, who certainly are not, and are not intended to be, discharged if no "indictment or presentment, or other proceeding," is found against them by a grand jury. Can it be pretended that the grand jury is in all cases to pass upon the soldiers enlisted or drafted into the service of the United States? and if the jury fail to find "an indictment or presentment, or other proceeding," against them, that the soldiers are all to be discharged? Clearly not. Congress most obviously did not include the army generally, when it spoke of persons "detained as prisoners under authority of the president." This return, be it observed, is to be made in all cases where the privilege of the writ is suspended. The language is, "whenever and wherever the said privilege shall be suspended," the said return shall be made. They must be "detained as prisoners under authority of the president." Yet, the second section provides, that all persons so detained shall be discharged unless a jury shall have found "an indictment, presentment or other proceeding" against them."

To show what "prisoners" were intended in the lists to be furnished by the secretaries of state and war, and that there might be no misapprehension, the act provides that it shall be "a list of all persons held as prisoners of the United States as state or political prisoners, or otherwise than as prisoners of war." If an ordinary soldier in our army can be said to be a prisoner under authority of the president, he is clearly not "a prisoner of war." If not a prisoner of war, and is yet to be regarded as a prisoner held under authority of the president, then the whole army, under the express provision of the second section, is entitled to be discharged, if no "indictment or presentment, or other proceeding," be found against them by a grand jury. It is quite clear that the act never intended that they should be discharged unless they were indicted, &c., and it seems equally clear that the

The People *v.* Gaul.

statute had no reference whatever to the ordinary soldiers of our army.

The provisions of the whole act, taken together, show that it was designed to enable the president to arrest and detain as prisoners persons charged with, or suspected of some offense against the government, persons deemed dangerous to the government, and to suspend the privilege of the writ of *habeas corpus* as to all such persons. The act was obviously aimed at "state or political prisoners." The act, as before stated, contains seven sections. The provisions of the first three have been already stated. The fourth declares "that any order of the president, or under his authority," during the rebellion, "shall be a defense in all courts to any action, &c. civil or criminal, &c. for any search, seizure, arrest or imprisonment," &c. Sections five and six regulate judicial proceedings in any suit brought for any such arrest or wrong done under color of any authority from the president, and provide for removing the suit to the courts of the United States. And the seventh section limits the time within which any such action may be brought, to two years. These provisions are designed to give efficiency to the orders of the president in making arrests, by shielding those who execute them. I need not cite authorities to show that in construing a statute all its provisions must be taken into consideration, and not any separate section or part of a section alone. It is in that way only that you can learn the spirit and purpose of the act. (*See Newell* v. *The People,* 7 *N. Y. Rep.* 9.) This rule of construction is as old as time, and will live as long. It applies to all writings, from the bible to the most ordinary contracts among men.

Again, if the privilege of this writ be suspended as to soldiers in the army, they have no relief whatever under the laws of the land, no mode of discharge by law, though they were kidnapped, and their names forged to the enlisting papers. They must bear the hardships and privations of a soldier's life, or meet his death, though they were not liable

to be drafted, and not receivable into the army as volunteers under the laws of congress, but were entrapped into the ranks by force or by fraud. The laws of the land afford them no relief, if this privilege be suspended as to them. The civil law lies paralyzed and powerless. They are, in truth, worse off than criminals, or persons charged with crime against the United States. As to them, while the privilege of the writ of *habeas corpus* is suspended, the act was careful to provide a remedy that they should be discharged as soon as the first grand jury had held a session, if not indicted, &c., and if they were indicted, and the offense were bailable, they should be admitted to bail. It is difficult to believe that congress ever intended to authorize any such injustice.

The construction I have put upon this act (that it includes public or political offenders only) also harmonizes with the constitution upon which it was based. The constitution of the United States declares that the privilege of this writ "shall not be suspended, unless when, in cases of rebellion or invasion, the public safety may require it." (*Art.* 1, § 9, *sub.* 2.) "The power of suspending the privilege of this writ (says Mr. Hurd, in his work on *Habeas Corpus*, p. 132) is, by the federal constitution, limited to those occasions in which the public safety is threatened by rebellion or invasion; and, by fair construction, is limited also to offenses endangering the public safety." This power of suspending the privilege of this writ had never been exercised by congress until the passage of the act under consideration. The senate, during the alleged conspiracy of Aaron Burr, passed a bill for that purpose, but it was almost unanimously rejected in the house. That act, as passed by the senate, accords with my construction of this act and with the constitution. It limits the suspension of the writ as to "all cases where any person or persons are charged on oath with treason or other high crime, or misdemeanor, endangering the peace, safety or neutrality of the United States." (*Id.*) In England, also, from whence we derive the substance and principle of our

writ of *habeas corpus,* I believe there has never been an instance, up to the present time, where the operation of this writ has been obstructed or impeded, except as to persons charged or suspected of political offenses—of offenses dangerous to the public safety. Since the contest between Charles I. and the parliament and people, which terminated in his public execution, there have been but two cases where the full power of the writ was suspended by act of parliament. The first was the suspension act of Mr. Pitt, in 1794, which empowered the king "to secure and detain persons suspected of conspiring against his person and government." The second was that of Lord Sidmouth, in 1817, which was of the same character. (*May's Con. Hist. of Eng.* 264, 268.) Thus it will be seen that there, as here, the purpose of conferring this power was the "public safety"—to protect the government against conspiracies. *Montesquieu* has well expressed it in his *Spirit of Laws,* published in 1748, in the chapter on the English constitution. "But," says he, "should the legislature think itself in danger by some secret conspiracy against the state or by a correspondence with a foreign enemy, it might authorize the executive power for a short and limited time to imprison suspected persons," &c. (*Book* 11, *ch.* 6, *or vol.* 1, *p.* 219, 3*d Eng. ed.*)

The meaning, then, of this provision in the constitution of the United States, would seem to be, that when the public safety is endangered by rebellion or invasion, the privilege of this writ may be suspended as to persons suspected of or charged with aiding, sustaining or promoting such rebellion or invasion, and thereby endangering the public safety. It was never designed, either here or in England, to prevent the discharge of persons illegally held as soldiers.

But I do not intend to discuss the constitutional power of congress to pass an act authorizing the suspension in other cases than those authorized by this act.

One question still remains. Has a state court power to issue a writ of *habeas corpus* in any case where the party

detained is held or claimed to be held under the authority of the laws of the United States?

Ever since the decision of this court in the *matter of Carlton,* (7 *Cowen,* 471,) which was decided in 1827, at a general term, opinion by Savage, Ch. J. the practice has been uniform in this state to allow writs in cases both of sailors and soldiers of the United States, alleged to be illegally detained, until a decision at chambers by a justice of this court in the fifth district, in August, 1863, (*matter of Hopson,* 40 *Barb.* 50.) The learned justice in that case seems to deny the authority of the state courts to issue such writ in any such case. That case, however, was different from this, or claimed to be different. There the party sought to be discharged was arrested and then held in custody as a deserter, which, as the learned justice says, "presents a question quite in advance of a simple inquiry into the validity of a contract of enlistment." Whether there is any distinction in principle between the two cases it is not material now to inquire. It is satisfactory to know that the learned justice did not, at chambers, overrule or assume to overrule in his decision, though he did in his reasoning, a decision of the general term of the supreme court, acquiesced in, uniformly affirmed and practiced upon in this state for nearly forty years.

One decision of this court at a special term held in the first district, in June, 1863, reported in the New York *Transcript,* ("in the *matter of Welsh,* an infant,") is to the same effect as that in 7 *Cowen,* before cited. In another decision in the same district, at special term, before Mr. Justice Leonard, August 17, 1863, reported in the *Transcript,* the learned justice, in a calm and well reasoned opinion, comes to a conclusion directly adverse to that of the justice at chambers in the fifth district. It was the case of an alleged deserter. He held that a *habeas corpus* was properly issued by state authority. He said: "This is not an inquiry whether Barrett is a deserter or not. The inquiry is whether he ever lawfully became a soldier, and whether he is lawfully in the

custody of an officer of the federal government?" I forbear, therefore, the discussion of a question which I regard as well settled in this state by authority — settled too, I may add, in a manner that entirely meets my approbation. Nor do I feel the least disposition to criticise the opinion of the learned justice in the fifth district, who seemed anxious to surrender the rights and liberties of our citizens to the exclusive care and protection of the federal judiciary, "whose judicial independence," he says, "is in its essential elements far superior to ours." In my view a judge has no more right to disclaim a duty which the law devolves upon him than he has to assume a power which is beyond his jurisdiction. Judges are occasionally influenced in some degree by a "spirit" very apt to mislead well meaning men, which they say "looks to the conservation of national life, higher than the mere letter of parchment constitutions." Dangerous doctrine for the guidance of any officers — wholly indefensible in judges.

The policy of this action by state courts seems to me as sound as the right to act is well settled. The perpetuation of our institutions, as well as the liberty of the citizen, is best secured by the continued exercise by the states of all the sovereign powers not granted to the general government. Should the rebellion be put down, the question as to the right to secede would not only be decided by the war, but a cause for secession would not probably again arise, common to so many states. This war has certainly called our attention to the dangers to liberty to be apprehended from the general government. No state maintains a standing army. Hence the civil law is supreme, so far as state action is concerned. In all times of great excitement, from whatever cause, party spirit runs high, and in such times it is difficult, almost impossible, for one party to see any wrong in tyrannical acts exercised on their adversaries. The general government maintains a standing army, and right or wrong, legal or simply arbitrary and tyrannical, its orders are enforced. The first duty of a soldier, as his discipline teaches, is to obey,

without cavil or inquiry, the orders of his superior. Generally his interest teaches the same lesson. Almost universally his practice accords with his teaching. Where, then, is the remedy for the oppressed citizen as against the tyranny of a general government boldly executed ?

Among the best guards against oppression by the general government is the steady exercise by the states of all their rightful powers, thereby inculcating a spirit of individuality, of independence and of manhood, wholly uncongenial to any thing but liberty.

The return in this case being insufficient, let an attachment issue against the officer, unless he comply with the mandate of the writ within ten days after the service of this order upon him.

[ALBANY SPECIAL TERM, May 16, 1865. *Peckham*, Justice.]