Supreme Court—General Term—First Department.

*January,* 1885.

## PEOPLE *v.* MARX.

CONSTITUTIONAL LAW.—" OLEOMARGARINE ACT," L. 1884, CH. 202.

To promote uniformity in the decision of the courts, a prior decision of a General Term upon a question, should be followed by the other General Terms of this court, and the final decision left to the Court of Appeals.

Especially is this the case where a contrary decision, on a question of constitutional law, would declare legal in one department an act which, by the decision of another General Term is declared to be a crime in another.

The "act to prevent deception in sales of dairy products," L. 1884, ch. 202, having been declared to be constitutional by a General Term of

which the right of the owner has become vested, may be taken for the public good without compensation. But we infer that the liquor in this case as in the case of Bartemeyer *v.* Iowa (18 *Wall.* 129), was not in existence when the liquor law of Massachusetts was passed. Had the plaintiff in error relied on the existence of the property prior to the law, it behooved it to show that fact. But no such fact is shown and no such point is taken." Beer Co. *v.* Massachusetts, 97 *U. S.* 25, 32.

In the well known case of Wynehamer *v.* People, 13 *N. Y.* 378, the defendant offered to prove that the liquor sold by him was owned by him at the time of the passage of the prohibitory act, and the Court of Appeals held that as the act made no discrimination between liquor owned when it took effect and that which might afterwards be manufactured or imported, the act was unconstitutional.

In the head-note to State *v.* Mugler, 44 *Amer. Rep.* 634 (29 *Kans.* 252) the decision is said to be "A law prohibiting the brewing and selling of beer applies to beer lawfully brewed before the law took effect but sold thereafter. The opinion shows however (44 *Am. Rep.* 640) that both the manufacture and sale were after the passage of the prohibitory act. In addition, the circumstances of that case and the provisions of the Kansas statutes distinguish it from the one at bar.

Upon the constitutional questions involved, see Matter of Paul, 2 *N. Y. Crim. Rep.* 1 ; Matter of Jacobs, *Id.* 346, 539.

this court in another Department (in People *v.* McGann, 3 *N. Y. Crim. Rep.* 1), such act must be held constitutional until the Court of Appeals declares otherwise

APPEAL by defendant, Morris Marx, from a judgment of the Court of General Sessions of New York county, of conviction of the crime of selling as an article of food, an article designed to take the place of butter produced from pure unadulterated milk or cream of the same, the article so sold being manufactured out of oleaginous substances and compounds thereof other than those produced from unadulterated milk or cream from the same, in violation of L. 1884, ch. 202, "An Act to prevent deception in sales of dairy products."

The alleged offense was committed October 31, 1884, the indictment was found December 4, 1884, and the conviction was had upon a trial December 24, in the New York Court of General Sessions, Hon. FREDERICK SMYTH presiding.

The evidence and facts appear in the opinions of the General Term.

At the close of the case of the prosecution on the trial the following proceedings took place :

Counsel for the defense moved the court to instruct the jury to acquit, on the grounds that no offense had been shown under the statute, and that the statute (*L.* 1884, ch. 202, § 6) is unconstitutional and void; claiming particularly that it comes within the decision in the case of Wynehamer *v.* People (13 *N. Y.* 378), in that it does not discriminate between property owned when the law took effect, and property subsequently acquired; that it is a violation of section 6 of article 1 of the constitution of the State, which provides that "no person shall . . . . be deprived of . . . . liberty or property without due process of law," and of the 14th amendment to the constitution of the United States, in that (1) it abridges the privileges and immunities of citizens of the United States ; (2) it deprives persons of both liberty and property without due process of law, and (3) it denies to persons within the State the equal protection of the laws.

SMYTH, Recorder.—" For reasons I have announced to the counsel for the defense and the district attorney, I have come to the conclusion to deny the motion on the grounds stated by the defendant's counsel. I have examined the cases of Wynehamer *v.* People, and Bertholf *v.* O'Reilly, in connection with the views expressed by the General Term of the Second Department, in People *v.* McGann, 3 *N. Y. Crim. Rep.* 1, and have given the matter such consideration as the shortness of the time would permit. I have come to the conclusion in this case that the questions raised by the defendant's counsel were passed upon in the case of McGann. An opinion has been rendered by the General Term of the Supreme Court of the Second Department in that case, in which it is held that this law is constitutional ; and I am bound to follow the decision of the Supreme Court. It would not be decorous or proper for me sitting at *nisi prius* to overrule that decision ; though I may say that arriving at the conclusion that this act is constitutional, I am inclined, with all due respect to the two judges who rendered that decision, to agree with the views expressed by Judge PRATT in his dissenting opinion. I will therefore deny your motion and give you an exception." Exception by the defense.

*Morris Marx*, the defendant, having been duly sworn as a witness on his own behalf, testified as follows :

I am the defendant in this case ; I know that I have been indicted for a crime—for selling a certain material known as oleomargarine butter.

Q. Please state to the court and jury whether this material that you sold was sold by you as oleomargarine, or as dairy butter ?

*District Attorney :* I object, upon the ground that the intent with which he sold this article is utterly immaterial and irrelevant to the issue framed in this indictment under the statute. If he sold an article which was not dairy butter manufactured from pure unadulterated milk, to take the place of butter as an article of food, it is a violation of the law.

*Defendant's counsel :* Q. I ask whether you had the intent to sell it as oleomargarine, or as dairy butter ? (Same objection.)

Q. I ask you, in making that sale, did you sell it as oleo-margarine or dairy butter? (Same objection.)

Q. Was it your design or intent at the time you made the sale to Mankin, that the material that you did sell him on that occasion should take the place of butter or cheese produced from pure unadulterated milk or cream as an article of food?

*District Attorney :* The question is objected to particularly and specifically upon the ground that the question of the intent with which the defendant in this indictment sold the article in question is not material or relevant except in so far as the intent is expressed in the statute; there need be no intent to deceive if the intent was to sell as an article of food.

The Court: Whether it was with a wicked or a good design is immaterial.

*District Attorney :* The question is this, Did you sell oleo-margarine? He had a right to sell oleomargarine for lubricat-ing, but not as a substitute for dairy produce. It will not be claimed that there was any criminal intent, any fraudulent in-tent on the part of the defendant. The whole claim is that there was a willful doing of the act forbidden in the statute.

*Defendant's counsel :* Then it is conceded by the people that there was no intent to defraud the purchaser by represent-ing the article to be what it was not.

*District Attorney :* We concede that.

*Defendant's counsel :* This is the concession. It is con-ceded by the people that at the time of the sale the defendant did not represent either by affirmative statement or otherwise or by concealment, that the article sold was other than it really was. And that in making such sale there was no intent on the part of the defendant to defraud or deceive the purchaser.

*District Attorney :* Except so far as the intent is expressed by the section of the act in question.

Further facts appear in the opinion.

*F. R. Coudert* and *Wheeler H. Peckham,* for defendant, ap-pellant.—I. The effect of the statutory provisions under consider-ation, if the construction put upon them by the people is cor-rect, is to destroy the property in oleomargine butter, and in

the machinery and materials for manufacturing it, owned and possessed by persons within the State, when the act took effect. The statute is therefore obnoxious to section 6 of article I. of the constitution of this state, and void. Wynehamer v. People, 13 *N. Y.* 378; Bertholf v. O'Reilly, 74 *N. Y.* 516.

II. Another effect of this statute is to deprive the defendant and other persons of the freedom of adopting and following the pursuit or business which they prefer; which is a material part of their liberty. For this reason also the statute is in conflict with the constitutional provisions cited. Butchers' Union, &c. Co. v. Crescent City, &c. Co., 111 *U. S.* 762.

III. Still another constitutional objection is, that this statute denies to persons within the state the equal protection of the laws. Section 1, XIVth Amendment, U. S. Constitution; Butchers' Union, &c. Co. v. Crescent City, &c. Co., *supra*, p. 757.

IV. It is conceded that the statute must be sustained, if at all, as an exercise of the police powers of the Legislature.

As there was not a word of testimony in the case, to show that the manufacture or sale of oleomargarine butter was in any way included in the proper subjects for the exercise of police powers, we find in that fact another reason why an acquittal should have been directed; and *a fortiori* it was error in the court to strike out proof that oleomargarine butter is as wholesome as dairy butter.

V. The cases relied upon below by the prosecution, are State v. Addington (12 *Mo. App. Rep.* 214, affirmed 77 *Mo.* 110), and the People v. McGann, *ante,* p. 1. The former decision arose under a law, nearly identical with the one under consideration. There is, however, the important difference that the title of the Missouri statute, plainly indicates its real object: " to prevent the manufacture and sale of oleaginous substances, or compounds of the same, in imitation of the pure dairy products," and in no way suggests or implies fraud, as does the title of our statute—" to prevent deception in sales of dairy products."

For the purposes of this case it is enough to say that the Missouri court, in its decision, expressly recognizes the fact that its conclusion is in conflict with that of our Court of Ap-

peals in Wynehamer *v.* People (*supra*), and disposes of it in a
way which will scarcely prevail here—simply overrules it.
(See 12 *Mo. App. Rep.* 227). The Supreme Court based its
affirmance chiefly on the reasoning below. And it is worthy
of note that the Chief Justice dissented. The McGann case
arose under the identical sixth section of the law of 1884, which
we are considering, and the majority of the court affirmed the
constitutionality of the law. Judge DYKMAN, who wrote the
prevailing opinion says, that if the law in question falls under
the condemnation of the constitution, it is because it offends
against the limitation of legislative power, that no person shall
be deprived of life, liberty or property without due process of
law; and, singularly enough, bases his conclusion that it does
not so offend, upon the cases of Wyenhamer *v.* People and
Bertholf *v.* O'Reilly, which, we respectfully submit, are conclu-
sive authority for the converse of his proposition. It is scarcely
accurate to say that "in both those cases the conclusion was
reached, that, notwithstanding such restriction, the legislative
power extends to the entire prohibition of the traffic in spiritu-
ous liquors." There has never been such an adjudication in
this State, certainly not in either of those cases. But even if
there had been, it would by no means follow that the manufac-
ture and sale of oleomargarine butter might be prohibited.
The statute under consideration in the Wynehamer case was
held unconstitutional, upon the precise ground urged in our
first point above. Indeed, the point is formulated from that
decision; and the opinion of the judges—not the adjudication
of the court—that such a law, which should be prospective only
in operation, would be constitutional, was based entirely upon
the special character of the traffic there affected. It is so inti-
mately connected with intemperance, pauperism and crime and
the consequent public burdens and private distress, and inse-
curity of life and property, that its regulation has always been
within the police power; and it is but a logical sequence from
the same premises which there extends those powers to prohi-
bition.

In Bertholf *v.* O'Reilly, the question of the power to pro-
hibit was not involved; and while there asserted, it is distinctly
put upon the conceded police power to restrain and prevent

the evils consequent upon intoxication.  So in the Slaughter House Case, a bare majority of the court, against vigorous dissent, sustained the act in question—which was entitled " to protect the health of the city of New Orleans," etc., and involved important sanitary considerations—on the sole ground that it was a police regulation ; holding, in substance, that it is not the province of the courts to interfere with legislation respecting a subject clearly within the police powers, on the ground that such legislation is beneficial to some and prejudical to the rights of others.  But it is clear that the Louisiana statute would never have been sustained, even by a majority of one, had it not been plainly connected with sanitary measures of great importance.  Even if we admit—which we certainly do not admit to the extent of the statement—that " the Legislature may prohibit and suppress any traffic injurious or demoralizing to the public health or public morals, or in its tendencies or consequences, and that the conclusion and decision of the Legislature on the question of the fact involved are final and conclusive," we insist, with confidence, that satisfactory proof that the Legislature has reached a conclusion and decision on that question, must appear in the act itself.  It is going very much further than the " utmost limit" of the Slaughter House Cases, to assume " in the consideration of this statute that the Legislature ascertained that the use of this prohibited article was injurious and detrimental to the public ;" and we deny that any presumption arises as to the motive which instigated the enactment, except such as appears upon the face of statute. See dissenting opinion of PRATT, J.

And this court, in a recent decision (Matter of Jacobs, 2 *N. Y. Crim. Rep.* 346), came to a like conclusion in reference to what is known as the " Tenement-house Cigar law."

The principles involved in that case are very closely allied to those which govern the case at bar.

We respectfully insist that until it be shown—which cannot be—that the manufacture and sale of oleomargarine butter is injurious to, or places in jeopardy the public health, no case within the police power is made out.  We go further.  Even should we admit the presumption suggested by Judge DYKMAN, that presumption is completely rebutted by proof

that the two kinds of butter are equally wholesome as food. Refute the "assumption" upon which the learned judge confessedly bases his opinion, and the. decision of the majority of that court falls to the ground. It is submitted that under the construction put upon the statute below and by the majority of the court in the McGann case, that the manufacture and sale of oleomargarine butter, with no representation or concealment intended or calculated to deceive as to the real character of the article, is a violation of law, it is demonstrated that the act is in contravention of the constitutional provisions cited, and is void.

VI. But, waiving the further considerations of constitutional objections, we respectfully submit that there has been no violation of the statute by this defendant. 1. If the sixth section is read and construed *in pari materia* with the title, and the other provisions of the act, it is manifest that the element of deception or intended deceit is essential to its violation. See remarks of Mr Justice PRATT in the McGann case. And the settled rules of construction require that it be so read: People *v*. Draper, 15 *N. Y*. 532; People *ex rel*. Starkweather *v*. Gaul, 44 *Barb*. 98; Jones *v*. Sheldon, 50 *N. Y*. 477; People *ex rel*. Cooke *v*. Wood, 71 *N. Y*. 371. And we may add that such is the only interpretation consistent with its constitutionality, it will be so construed. Roosevelt *v*. Godard, 55 *Barb*. 533; People *ex rel*. Bolton *v*. Albertson, 55 *N. Y*. 50. That is to say, "*designed* to take the place of butter" must be construed, "fraudulently designed," etc. 2. It having been proved that the article sold by the defendant was composed of ingredients chemically identical with those of dairy butter, produced from unadulterated milk or cream, no case is made out against him. The prohibition of the statute is against the character of the oleaginous substances used in the manufacture, and not against the source from which they are obtained or the manner of extraction.

*Randolph B. Martine*, district attorney (*DeLancey Nicoll*, assistant), for the people, respondent.

BRADY, J.—The appellant was convicted for selling an ar-

ticle in contravention of the prohibition contained in the following section of chap. 202 of the Laws of 1884 :

" 6. No person shall manufacture out of any oleaginous substance or substances, or any compound of the same, other than that produced from unadulterated milk, or of cream from the same, any article designed to take the place of butter or cheese produced from pure, unadulterated milk or cream of the same, or shall sell, or offer for sale, the same as an article of food. . . . Whoever violates the provisions of this section shall be guilty of a misdemeanor, and be punished by a fine of not less than one hundred nor more than five hundred dollars, or not less than six months' or more than one year's imprisonment, or by both such fine and imprisonment, for the first offense, and by imprisonment for one year for each subsequent offense."

It was contended upon the trial, that the act mentioned was unconstitutional and void, and being so no offense had been committed. The learned Recorder presiding, reluctantly expressed himself adversly to this proposition, but felt bound by the decision of the General Term of the second district declaring the act to be constitutional. He was inclined to agree with Justice PRATT, who dissented. See People *v.* McGann, 3 *N. Y. Crim. Rep.* 1.

This case presents all the elements for the final adjudication of the mooted question, inasmuch as it is conceded that there was no intent by the appellant on the sale, to defraud the purchaser, by representing the article to be what it was not. In other words, it was sold as oleomargarine, and because there is also proof in the case showing that it was made of pure fat and that upon analysis its constituent elements proved to be the same as dairy butter.

Indeed it was shown by Mr. Henry Morton, a professor of the science of technology at the Stevens' Institute, Hoboken, New Jersey, that oleomargarine was first devised or invented in 1872 or 1873 during the Franco-Prussian war by Professor Mége, a man of scientific attainments and much reputation, and who it was reported, had been employed by the French Government to devise a substitute for butter. Mr. Morton also confirmed the testimony given on behalf of the people, as to the elements of oleomargarine. He said : " Oleomargarine is a

word used for two things. It is often used for the product obtained by the treatment of fats, by which there is gotten out from the fat a pure fatty substance having almost the identical elements of the fats existing in butter; and the word is also used to indicate the marketable article produced, when that pure fatty substance is churned up with milk or cream and perhaps mixed with butter, so as to be in a condition of solid emulsion for use on the table. Now the oleomargarine before it is churned consists substantially of three fatty bodies, stearine, palmatine, and oleine. These three substances are the only materials present in and constituting the oleomargarine stock or oleomargarine oil, as it is called, prior to its manufacture into table butter. And those are three of the fats which exist in ordinary butter. There is present in ordinary dairy butter a fourth fatty substance, known as butyrine."

He also, in answer to a question whether there was any difference between oleomargarine and oleomargarine butter, said the former meant the pure fats, and the latter the product when some of that fat had been churned up with a certain amount of cream or the like, so that a certain amount of butyrine had been introduced, and a little cheesy substance or curd which it gets from the milk. He said also, that the only difference chemically speaking between oleomargarine butter and dairy butter was that there was more butyrine in the latter. And further still that the former contained all the elements of the latter. Professor Chandler, who had been chemist of the Board of Health for many years, its president for many years, and chairman of the Sanitary Committee for several years, also said that oleomargarine was manufactured in a very cleanly manner, more so than dairy butter, and that they were equally wholesome. Dr. George F. Morris, physician, surgeon and an inspector of the Board of Health, was also called by the appellant, but the learned district attorney then said " we do not propose to controvert this testimony. It is conceded that the witness will testify in substance as Professors Morton and Chandler have on the subject on which they were examined;" and this closed the testimony for the defense. The question to be considered by the court of last resort is therefore squarely presented, and it is whether the Legislature is gifted with the

power to declare, under any possible pretense, that the sale of an article of merchandise made from pure and wholesome materials, and in itself harmless, pure and wholesome, and therefore not injurious, deleterious or dangerous to public health, and combining the elements of an article of commerce not contraband, but recognized, sold and protected, can be prohibited, under pains and penalties or at all. Such a sale, while it might excite the antagonism of dealers in dairy butter, and naturally arouse a spirit of opposition not easily quelled, would not, it would seem, either affect the public morals or the public health, and would not therefore invoke the intervention of legislative authority as to either of these elements. Accepting the statement of Professor Morton, the production of oleomargarine was the result of scientific experiment and investigation, with a view to find a substitute for dairy butter, and not with an intention to create a substance in any respect injurious or less wholesome. It was not conceived in fraud or for mischievous purpose, and therefore, the only harm its discovery and use could accomplish would be its sale as dairy butter which it resembles in color and flavor. No one could doubt the propriety of any legislation designed to prevent this. No honest dealer would sell oleomargarine for dairy butter, but all tradesman are unfortunately not honest, and hence the necessity of legislative action relative to a variety of transactions of daily life. A person seeking butter made at a dairy should not be imposed upon by receiving oleomargarine, and *vice versa*, and hence the dealer should be bound to declare what either and both is, if he sells both, or either if he sells but one. But without further pursuing this subject, which we do not feel at liberty to discuss, it is thought that uniformity in the laws promulgated by the several departments of the state, should, if possible, prevail, leaving the parties concerned to their right to invite by appeal the determination of the court of last resort, and therefore the judgment pronounced by a majority of the justices of the General Term of the second department is accepted as controlling upon the question presented by the record, whatever views we may entertain and would express were the question new. If we held the law unconstitutional in this department the sale of oleomargarine would be lawful, and no prosecutions under the act men-

tioned, in this county, could well succeed, while in an adjoining department the sale would be unlawful and a prosecution warranted. The contemplation of this diversity invokes the necessity of concurrence, and the decision of the court of last resort. For these reasons we affirm the conviction, with the suggestion that every facility should be granted the appellant for a speedy presentation of the point considered, to the Court of Appeals.

DANIELS, J.—Section six of chapter 202 of the laws of 1884 was designed to prohibit the manufacture of any oleaginous substance, or compound designed to take the place of butter or cheese as butter when not made from unadulterated milk or cream, and to prohibit the same from being sold, or offered for sale, as that article of food. The act intended to be made criminal by this enactment is the manufacture of the prohibited article with the design that it shall take the place of butter or cheese manufactured from unadulterated milk or cream, or that it shall, when having been so manufactured be sold, or offered for sale, as that article of food. It is the design to to deceive when embodied in these acts or either of them, which the law has rendered the subject of punishment. And that the design to sell the article so manufactured as butter existed in this case, was made reasonably clear by the evidence. It was in that design and act that the offense consisted. It was sufficiently charged. And it was within the province of the Legislature to prohibit it and declare the violation of the prohibition to be a criminal offense. The judgment accordingly should be affirmed.

DAVIS, P. J.—I think it is not just to the accused to hold upon the evidence, that he was guilty of selling oleomargarine *as butter*, in any way that would, or was intended to deceive the purchaser. The buyer bought oleomargarine because he wanted that article as food, and because he could buy it cheaper than butter. There is nothing to show that it was in fact deleterious or hurtful as food, so that the purchaser who wanted it should be for sanitary or police reasons protected against his own choice or taste.

The case ought to be regarded as a plain one, presenting a clear constitutional question touching the power of the Legislature to prevent, arbitrarily and absolutely, the manufacture and sale of a particular article of food, not, when wholesome and pure, in anywise injurious to those who from cheapness, poverty or taste, prefer, or are obliged to use it.

In short, the question is to be considered just as it would be, if butter, the product of pure and unadulterated milk or cream, were the thing prohibited to be made or sold by any person in the state. Its merits would then be visible in a light as clear and distinct as a noonday sun to every one, except possibly a manufacturer or vender, of oleomargarine.

But as my brother BRADY has shown this court sitting in another department has passed upon the validity of this law. Due respect for its adjudication requires us to accept that conclusion as correct and to put this case by affirmance in a proper position for the final settlement of the question by the court of last resort.

I concur in that result for that purpose.

Judgment of conviction affirmed.