THE STATE v. LOOMIS *et al., Appellants.*

In Banc, March 25, 1893.

**Constitution:** CLASS LEGISLATION: DUE PROCESS OF LAW: PAYMENT OF WAGES: ORDERS ON STORE: STATUTE. Sections 7058 and 7060, Revised Statutes of 1889, making it a misdemeanor for any corporation, person or firm engaged "in manufacturing or mining" to issue in payment of the wages of its laborers any order, check, memorandum, token or evidence of indebtedness, payable otherwise than in lawful money of the United States, unless the same is negotiable and redeemable at its face value in cash or in goods or supplies, at the option of the holder, at the store or other place of business of the corporation, person or firm, is class legislation and as such is violative of the constitutional guaranty of "due process of law" and void. (BARCLAY, J., *dissenting.*)

*Appeal from Macon Circuit Court.*—HON. ANDREW ELLISON, Judge.

REVERSED.

*Dysart & Mitchell* and *Lee, McKeighan, Ellis & Priest* for appellants.

(1) Sections 7058 and 7060 must be construed together as referable to the same subject-matter and as parts of the same act (Acts, 1885, pp. 83–84), and, being so construed, they are in violation of section 16, article 2 of the constitution of Missouri, which provides: "That imprisonment for debt shall not be allowed except for the non-payment of fines and penalties imposed for violation of law." The act in question is in substance an act authorizing imprisonment for non-payment of

debt. *State v. Coal & Coke Co.*, 20 S. W. Rep. 499.
(2) The act in question transcends the due and proper
bounds of legislative power without regard to specific,
federal or state constitutional provision. Cooley on
Constitutional Limitations [4 Ed.] pp. 492–3, sec. 393;
*Budd v. N. Y.*, 143 U. S. 517. (3) *First*. The act
in question is unconstitutional, null and void, in that
it violates the following provisions of the constitution
of the United States: "Section 10, article 1. No
state shall enter into any treaty, alliance or confedera-
tion; grant letters of *marque* and reprisal; coin money;
emit bills of credit; make anything but gold and silver
coin a tender in payment of debts; pass any bill of
attainder, *ex post facto* law, or law impairing the obli-
gation of contracts, or grant any title of nobility."
*Second*. It violates the following portion of article 5
of the amendments of the federal constitution, viz:
"No person * * * shall be compelled in any crim-
inal case to be a witness against himself, nor be
deprived of life, liberty or property without due pro-
cess of law." *Third*. It also violates the fourteenth
amendment to the federal constitution, which prohibits
the states of the union from depriving "any person of
life, liberty or property without due process of law,"
and also from denying "to any person within its juris-
diction the equal protection of the laws." (See cases
cited in subdiv. 5.) (4) *First*. The act in question
violates the following provision of the constitution of
the state of Missouri, sec. 15, art. 2, "That no *ex post
facto* law, nor law impairing the obligation of con-
tracts, or retrospective in its operation, or making any
irrevocable grant of special privileges or immunities,
can be passed by the general assembly." *Second*. It
violates section 30, article 2, of the constitution of
Missouri, which provides "that no person shall be
deprived of life, liberty or property without due pro-

cess of law." *Third.* It violates section 53, article 4, of the constitution of Missouri, which provides that no law shall be passed "granting to any corporation, association or individual any special or exclusive right, privilege or immunity." (5) The act in question grants to employes of mining companies the exclusive right, privilege and immunity of violating their contracts; justifies their refusal to be bound by them, and punishes by fine the party whose only offense is in insisting on the contract being performed. *First.* It grants to the employes of mining and manufacturing companies the special and exclusive right, privilege and immunity, which is denied employes of all other companies, of being relieved from the provisions of section 8161, relating to the set-off of mutual debts, and section 2050, Revised Statutes of Missouri, which gives to every defendant the right of counter-claim for any cause of action arising on contract. *Second.* It also grants to employes of mining and manufacturing companies the special and exclusive right and privilege of turning a non-negotiable order or contract into an absolute and unconditional negotiable instrument, which the parties by contract have declared shall be non-negotiable and shall be paid only in goods or merchandise. *Third.* It deprives mining and manufacturing employers of the right to make contracts which persons and corporations in all other lines of business have the right to make. It is, therefore, void, as being class legislation and as denying to persons engaged in the mining and manufacturing business the equal protection of the law. *People v. Otis*, 90 N. Y. 48; *State v. Goodwill*, 33 W. Va. 179; *State v. Coal & Coke Co.*, 33 W. Va. 188; *West Virginia v. Fire Creek Co.*, 6 L. R. A. 359; *Commonwealth v. Perry*, 34 Cent. L. J. (1891) 78, (28 N. E. Rep. 1126); *Godcharles v. Wigeman*, 113 Pa. St. 431, (6 Atl. Rep.

354); *Millett v. People,* 117 Ill. 294 (7 N. E. Rep. 631); *Frorer v. People,* 31 N. E. Rep. (Ill. Sup.) 395; *Ragio v. State,* 86 Tenn. 272 (6 S. W. Rep. 401); Cooley on Constitutional Limitations [4 Ed.] sec. 393, p. 492, *et seq.; Budd v. N. Y.,* 143 U. S. 517.

BLACK, J.—This is an information in two counts, filed by the prosecuting attorney of Macon county against the three defendants engaged in carrying on the business of mining coal in that county. The first count avers that the defendants did unlawfully issue and circulate in payment of wages a certain order, check, etc., payable to P. Daniels otherwise than in money, without being payable at the option of the holder in merchandise or money. The second count states in substance that defendants unlawfully failed to redeem a certain order, check, etc., issued to P. Daniels in payment for wages, the same having been presented for payment thirty days from the date of the delivery thereof.

The information is based upon sections 7058 and 7060 of the Revised Statutes of 1889. The first of these sections provides:

"It shall not be lawful for any corporation, person or firm engaged in manufacturing or mining in this state to issue, pay out or circulate for payment of the wages of labor, any order, check, memorandum, token or evidence of indebtedness, payable in whole or in part otherwise than in lawful money of the United States, unless the same is negotiable and redeemable at its face value, without discount, in cash or in goods, wares or merchandise or supplies, at the option of the holder at the store or other place of business of such firm, person or corporation; * * * and the person who, or corporation, firm or company, which, may issue any such order, check, memorandum, token or other evidence of

indebtedness, shall, upon presentation and demand within thirty days from date or delivery thereof, redeem the same in goods, wares, merchandise or supplies at the current cash market price for like goods, wares, merchandise or supplies, or in lawful money of the United States, as may be demanded by the holder . of any such order, memorandum, token or other evidence of indebtedness; *provided*," etc.

Section 7060 makes it a misdemeanor for any person, firm or company engaged in mining or manufacturing to issue or circulate in payment of wages any order, check, etc., payable otherwise than as provided in section 7058, or to fail to redeem any such order, check, etc., in money when presented for payment.

The circuit court, sitting as a jury, found the defendants guilty as charged in the first count of the information and assessed their punishment at a fine of $10, and they appealed.

The evidence discloses the following facts: The defendants, composing the firm of Loomis & Snively, were the owners of coal mines, and in connection with that business carried on a store. Peter Daniels worked for them as a miner. At the end of January, 1891, he owed them $43.20. On the eighteenth of the following February he had earned as wages during that month $5.50, and on that day he requested and the defendants' clerk gave him a "credit coupon check book" upon their store. The coupons were in sums of five, ten and twenty-five cents, and aggregated $5. It is stated on the back of the book that "the coupons in this book are not good if detached, and are payable only in merchandise when presented by P. Daniels." Each coupon says, "good for merchandise at our store, not transferable. Loomis & Snively."

Daniels assigned this check book to Burge, who assigned it to Hughes and he transferred it to Mr.

Williams. The latter presented it to the defendants for payment on the second of April, 1891, and they then refused payment. The proof shows that defendants had monthly pay-days. On these days they gave out no orders or checks but paid the miners what was due them in cash. At the close of the evidence the defendants asked the court to discharge them, because the statute upon which the. information was founded was unconstitutional and therefore void, which request the court refused.

The contention is, that the two sections of the statute before mentioned are in conflict with several clauses of the constitution of this state, and especially the following:

"1. That all persons have a natural right to life, liberty and the enjoyment of the gains of their own industry."

"2. That no person shall be deprived of life, liberty or property without due process of law."

"3. And that they violate that part of the fourteenth amendment of the constitution of the United States, which declares 'nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person the equal protection of the laws.' "

The words, "due process of law," as used in these clauses of both constitutions mean the same as "the law of the land." 2 Story on the Constitution [5 Ed.] sec. 1943; Cooley on Constitutional Limitations [6 Ed.] 430.

It was said in *Railroad v. Humes*, 115 U. S. 512: "In England the requirement of due process of law, in cases where life, liberty and property were affected, was originally designed to secure the subject against the arbitary action of the crown, and to place him under the protection of the law. The words were held to be

the equivalent of 'law of the land.' And a similar purpose must be ascribed to them when applied to a legislative body in this country."

It is now axiomatic that, "everything which may pass under the form of an enactment is not therefore to be considered the law of the land." Speaking of these words, Mr. Justice JOHNSON said: "They were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." *Bank of Columbia v. Okely*, 4 Wheat. 235. Law of the land is said to mean a law binding upon every member of the community under similar circumstances. *Wally's Heirs v. Kennedy*, 2 Yerg. 554. The word "liberty" as used in these constitutional declarations means more than freedom of locomotion. It includes and comprehends among other things, freedom of speech, the right to self defense against unlawful violence and the right to freely buy and sell as others may. 2 Story on the Constitution [5 Ed.] sec. 1590.

From the foregoing descriptions and definitions of "due process of law" or its equivalent "law of the land" it must be evident that this constitutional safeguard condemns arbitrary, unequal and partial legislation; and it is equally clear that the right to make contracts and have them enforced, as others may, is one of the rights so secured to every citizen. There is no doubt but many of our legislative enactments operate upon classes of individuals only, and they are not invalid because they so operate, so long as the classification is reasonable and not arbitrary. Thus it is perfectly competent to legislate concerning married women, minors, insane persons, bankers, common carriers and the like; and the power of the legislature to prescribe police regulations applicable to localities and classes is very great, because such laws are designed to protect property and the

safety, health and morals of the citizen. But classification for legislative purposes must have some reasonable basis upon which to stand. It must be evident that differences which would serve for a classification for some purposes furnish no reason whatever for a classification for legislative purposes. The differences which will support class legislation must be such as in the nature of things furnish a reasonable basis for separate laws and regulations. Thus the legislature may fix the age at which persons shall be deemed competent to contract for themselves, but no one will claim that competency to contract can be made to depend upon stature or color of the hair. Such a classification for such a purpose would be arbitrary and a piece of legislative despotism, and therefore not the law of the land.

When speaking upon this subject, Judge Cooley says:

"The doubt might also arise whether a regulation made for any one class of citizens, entirely arbitrary in its character in restricting their rights, privileges or legal capacity in a manner before unknown to the law, could be sustained, notwithstanding its generality. Distinctions in these respects must rest upon some reason upon which they can be defended—like the want of capacity in infants and insane persons; and, if the legislature should undertake to provide that persons following some specified lawful trade or employment should not have capacity to make contracts, or to receive conveyances, or to build such houses as others were allowed to erect, or in any other way to make such use of their property as was permissible to others, it can scarcely be doubted that the act would transcend the due bounds of legislative power, even though no express constitutional provision could be pointed out with which it would come in conflict. To forbid to an individual or a class the right to the acquisition or enjoyment of

property in such manner as should be permitted to the community at large, would be to deprive them of *liberty* in particulars of primary importance to their 'pursuit of happiness;' and those who should claim a right to do so ought to be able to show a specific authority therefor, instead of calling upon others to show how and where the authority is negatived." Cooley's Constitutional Limitations [6 Ed.] 484.

There can be no doubt but the legislature may regulate the business of mining and manufacturing so as to secure the health and safety of the employes, but. that is not the scope of the two sections of the statute now in question. They single out those persons who are engaged in carrying on the pursuits of mining and manufacturing, and say to such persons, you cannot contract for labor payable alone in goods, wares and merchandise. The farmer, the merchant, the builder and the numerous contractors employing thousands of men may make such contracts, but you cannot. They say to the mining and manufacturing employes, though of full age and competent to contract, still you shall not have the power to sell your labor for meat and clothing alone as others may.

It will not do to say these sections simply regulate payment of wages, for that is not their purpose. They undertake to deny to the persons engaged in the two designated pursuits the right to make and enforce the most ordinary every-day contracts—a right accorded to all other persons. This denial of the right to contract is based upon a classification which is purely arbitrary, because the ground of the classification has no relation whatever to the natural capacity of persons to contract.

Now it may be that instances of oppression have occurred and will occur on the part of some mine-owners and manufacturers, but do they not occur quite as frequently in other fields of labor? Conceding that

such instances may and do occur, still that furnishes no reasonable basis for depriving all persons engaged in the two lawful and necessary pursuits of the right to make and enforce every-day contracts.

Liberty, as we have seen, includes the right to contract as others may; and to take that right away from a class of persons following lawful pursuits is simply depriving such persons of a time-honored right which the constitution undertakes to secure to every citizen. Applying the principles of constitutional law before stated, we can come to no other conclusion than this, that these sections of the statute are utterly void. They attempt to strike down one of the fundamental principles of constitutional government. If they can stand, it is difficult to see an end to such legislation, and the government becomes one of special privileges, instead of a compact "to promote the general welfare of the people." We place our conclusion on the broad ground that these sections of the statute are not "due process of law" within the meaning of the constitution.

Statutes like or analagous to the one in hand have been enacted in several of the states of this union, and they have been the subject of consideration of several courts of last resort, and it is well to examine those cases with some detail; for it must be obvious that general constitutional declarations are the better understood when seen in the light of the facts of the particular cases in which they have been applied.

The supreme judicial court in Massachusetts had under consideration, in *Commonwealth v. Perry*, 28 N. E. Rep. 1126, a statute which provides that "no employer shall impose a fine upon or withold the wages, or any part of the wages, of an employe engaged at weaving, for imperfections that may arise during the process of weaving." It was held that if the act went no further than to forbid the imposition of a fine for

imperfect work it might be sustained, but that the
attempt to make inferior work answer a contract for
good work presented a different question; that the
right to acquire, possess and protect property includes
the right to make reasonable contracts, which shall be
under the protection of the law. Says the court: "If
it (the statute) be held to forbid the making of such
contracts, and to permit the hiring of weavers only
upon terms that prompt payment shall be made of the
price for good work, however badly their work may be
done, and that the remedy of the employer for their
derelictions shall be only by suits against them for
damages, it is an interference with the right to make
reasonable and proper contracts in conducting a legiti-
mate business, which the constitution guarantees to
every one when it declares that he has a 'natural,
inalienable right of acquiring, possessing and protecting
property.'"

*Godcharles v. Wigeman,* 113 Pa. St. 431, was an
action brought by Wigeman to recover wages as a
puddler. Plea of payment, etc. During the time of
his employment the plaintiff asked for and received
orders from defendants on different parties for coal and
other articles, which orders were honored by the parties
on whom drawn and the defendants paid them. It
scems an act of the legislature made all orders given by
employers engaged in the business of manufacturing,
to their workmen, payable in goods or anything but
money void. Speaking of these sections of the act the
court said: They "are utterly unconstitutional and
void, inasmuch as by them an attempt has been made
by the legislature to do what, in this country, cannot be
done; that is, prevent persons who are *sui juris* from
making their own contracts. The act is an infringement
alike of the right of the employer and the employe;
* * * he may sell his labor for what he thinks best,

whether money or goods, just as his employer may sell his iron or coal; and any and every law that proposes to prevent him from so doing is an infringement of his constitutional privileges, and consequently vicious and void.''

In *State v. Goodwill*, 33 W. Va. 179, a statute of that state prohibited persons engaged in mining and manufacturing from issuing orders in payment of labor, except such as should be made payable in money; it made a violation of its provisions a misdemeanor. The constitution of that state declares that all men have certain inherent rights; that is to say "the enjoyment of life and liberty with the means of acquiring and possessing property and of pursuing and obtaining happiness and safety.'' The statute was held unconstitutional after a full consideration. Says the court: ''The right to use, buy and sell property and contract in respect thereto, including contracts for labor—which is, as we have seen, property—is protected by the constitution.'' The scope of the opinion is well summarized in the head note in these words: ''It is not competent for the legislature, under the constitution, to single out owners and operators of mines and manufacturers of every kind and provide that they shall bear burdens not imposed on other owners of property or employers of labor, and prohibit them from making contracts which it is competent for other owners of property or employers of labor to make.'' And this ruling was followed and approved in *State v. Coal & Coke Co.*, 33 W. Va. 188.

The statute brought in question in *Millett v. People*, 117 Ill. 294, required all coal produced in the state to be weighed on scales to be furnished by the mine owners, and subjected the mine owners to a fine or imprisonment for a failure to comply with its provisions. By another section it was provided "that all contracts

for the mining of coal, in which the weighing of the coal as provided for in this act shall be dispensed with, shall be null and void." It was held that the mine owners could not be compelled to make their contracts for mining coal so as to be regulated by weight, and that they could not be compelled to keep and use scales for such purposes, save when they saw fit to make contracts for mining on the basis of weight. The law was considered repugnant to the constitutional provision that "no person shall be deprived of life, liberty or property without due process of law;" that to single out coal mine owners and prohibit them from making contracts which it was competent for other employers of labor to make was not due process of law. And for like reasons the same court held an act void which denied to persons and corporations engaged in mining and manufacturing the right to keep or be interested in a truck store for furnishing supplies, etc. *Frorer v. People*, 31 N. E. Rep. 395.

Some of the cases just cited cannot be distinguished from this one. In others there is some difference in the facts and in the statutes considered, and in some of them the constitutional provisions use different words from the clauses of our constitution before set out; but the cases just cited are all in point of principle like the one in hand. The differences, such as they are, strengthen rather than weaken the conclusion which we have before expressed; for it must be evident that they all teach this doctrine, that constitutional declarations concerning the liberty of the citizen, though using different words, are not to be reduced to an empty sound. Liberty we have seen includes the right to acquire property and that means and includes the right to make and enforce contracts. We do not say that such rights cannot be regulated by general law, but we do say that the legislature cannot single out one

class of persons who are competent to contract and deprive them of rights in that respect which are accorded to other persons. The constitutional declaration, that no person shall be deprived of life, liberty or property without due process of law, was designed to protect and preserve their existing rights against arbitrary legislation as well as against arbitrary executive and judicial acts. The sections of our statute in question deprive a class of persons of the right to make and enforce ordinary contracts, and they introduce a system of state paternalism which is at war with the fundamental principles of our government, and, as we have before said, are not due process of law.

It cannot be said that these defendants, in operating their coal mines, are pursuing a public business, or that they have in any way, shape or form devoted their property to a public use; and this being so the cases of *Munn v. Illinois*, 94 U. S. 113, and *Budd v. New York*, 143 U. S. 517, are not in conflict with what we have said. On the contrary the line of argument pursued in those cases goes far to show that a statute like the one in hand cannot stand. The many adjudications upholding police regulations need not be noticed, for it cannot be claimed that the law in question is of that character. The case of *Hancock v. Yaden*, 121 Ind. 366, goes far to support and uphold this law, but we cannot agree to the doctrine of that case. Slow as we are and should be to declare legislative enactments void, we can reach no other conclusion than that before expressed.

The judgment is reversed and the defendants discharged. All concur except BARCLAY, J., who dissents.

### SEPARATE OPINION.

BARCLAY, J.—The reasons of my learned associate, Chief Justice BLACK, for holding the statute unconsti-

tutional seem to me unsatisfactory, and the importance of the case warrants a statement of the grounds of dissent.

1. There is no issue touching the impairment of obligation of any contract concluded before the passage of the act. The transactions in view occurred long afterwards. The only controversy now is whether or not the statute violates the guaranties of "liberty" and "property," and of "due process of law," on which the judgment of the majority of the court is placed.

In the principal opinion it is conceded that the legislature has power to restrict freedom of contract in some directions, and in respect of certain parties; for example, "infants and insane persons." That concession may be taken as a starting point for the present investigation. For when it is granted that liberty to make contracts is not absolute and unlimited, our difference is narrowed into the inquiry, what is the peculiarity of the subject-matter of the statute under review which exempts it from regulation by the law-making power?

One reason given for condemning the law before us is that the subjection of corporations and other persons operating mines and manufacturing establishments to such regulation is a "purely arbitrary" classification; therefore, an infringement of their constitutional liberty.

Although that proposition seems a vital one to support the conclusion reached, it is said in another part of the opinion that "it is perfectly competent to legislate concerning married women, minors, insane persons, bankers, common carriers, and the like."

In this connection the supreme court has held (in a case which furnishes an elaborate list of instances of such legislation) that "class legislation is not necessa-

rily obnoxious to the constitution. It is a settled construction of similar constitutional provisions that a legislative act which applies to and embraces all persons 'who are or who may come into like situations and circumstances' is not partial." *Humes v. Railroad* (1884), 82 Mo. 231, cited recently and followed in an opinion by the present chief justice in *Perkins v. Railroad* (1891), 103 Mo. 56. To the same point, see *Budd v. New York* (1892), 143 U. S. 517.

The lawmaker necessarily deals with conditions as he finds them. If he observes and wishes to abate some fraudulent practice or abuse of power prevailing only in one line of business, the fact that, in legislating to correct it, he does not also include in his remedy all other phases in human affairs, can furnish no reason for stigmatizing his remedy as no law at all. If an act reaching only mining and manufacturing concerns is, on that account, not "due process of law," what must be held of statutes establishing special rules of liability, or business regulations, applicable to railroads only, to warehousemen, pawnbrokers, auctioneers, millers, and the many other classes of persons whose affairs form topics of treatment in separate laws in Missouri. Are all such statutes void because each relates to persons engaged only in the particular class of business named in it? Probably they would not be so held. Some of them are acted on and enforced almost daily. Yet if they are valid, what, let me ask, is there so exceptional about the truck system that precludes legislation applicable to those lines of business in which it prevails.

If laws regulating the contracts of bankers (Revised Statutes, 1889, sec. 706), common carriers (Revised Statutes, 1889, sec. 944), mechanics (Revised Statutes, 1889, sec. 6705), and insurance companies (Revised Statutes, 1889, sec. 5856), as distinct classes of persons are

constitutional, and involve no invasion of their rights to
"liberty or property," how can the position be main-
tained that such legislation touching contracts of
miners and manufacturers invades these rights? The
opinion certainly furnishes no reason, founded on any
language of the constitution, for nullifying the latter,
while approving the former statutes. It admits that
"the legislature may regulate the business of mining
and manufacturing so as to secure the health and
safety of the employes."

In *Durant v. Mining Co.* (1889), 97 Mo. 62, the
same learned judge gave full effect to a statute "pro-
viding for the health and safety of persons employed in
coal mines." Session Acts, 1881, p. 165.

If a law applicable only to persons engaged in min-
ing is constitutional when dealing with the topics of
their health and safety, it is obvious that an act
designed to prevent fraud or oppression in the payment
of wages in mining and manufacturing enterprises is
not objectionable on the ground of the selection or
"classification" of those enterprises as subjects for sep-
arate legislation.

Touching this particular point, the supreme court
of the United States has said:

"Legislation is not open to the charge of depriving
one of his rights without due process of law, if it be
general in its operation upon the subjects to which it
relates." *Dent v. West Virginia* (1889), 129 U. S. 124.

The same court has held that statutes creating a
different rule of liability, as applied to one class of per-
sons, from that generally in force, do not infringe the
right to "due process of law." *Railroad v. Humes*
(1885), 115 U. S. 512; *Railroad v. Mackey* (1888), 127
U. S. 205. And the supreme court of this state has
determined that "a statute which relates to persons or
things as a class is a general law, while a statute which

relates to particular persons or things of a class is special." *State ex rel. Lionberger v. Tolle* (1880), 71 Mo. 650.

If the act is invalid, it cannot be because it treats of mining and manufacturing concerns only. *In re Oberg* (1891), 21 Ore. 406; 14 L. R. A. 577; *Youngblood v. Trust & Sav. Co.* (Ala. 1892), 12 South. Rep. 579.

2. The foremost ground of the opinion is to be found in the ruling that the constitutional guaranty of "due process" condemns "arbitrary, unequal, and partial legislation;" that the statute in question is of that nature, and is therefore annulled as unconstitutional and void. With due respect for the judgment of my colleagues, that view appears to me erroneous. The act, in part, was passed in 1881. It was amended in 1885, and re-enacted by the revision of 1889. It has thus received the sanction of the thirty-first, thirty-third and thirty-fifth General Assemblies of Missouri and of Governors Crittenden, Marmaduke and Francis successively. Its plain purpose is to put some restraint upon that sort of freedom which would permit the employer to contract for labor, payable in goods, and then place his own prices on the goods delivered in payment.

The general objects of such a law, as well as the principle upon which it rests, have been fully stated by English judges, having before them a British law of similar character, commonly called the "Truck Act." 1 & 2 Wm. IV. (1831) ch. 37.

"In passing the statute referred to, the legislature seems to have considered the artificer as requiring special protection in his dealings with his employers, and to have thought it right, therefore, to make the contracts between these parties one of the exceptions to the general rule, that persons should be allowed to make their own contracts in their own way. The par-

ticular evil intended to be remedied (and which, not-
withstanding former enactments, still prevailed) was
the truck system or payment by masters of their men's
wages wholly or in part with goods, a system mani-
festly to the disadvantage of the workman, who was
practically, forced to take the goods at his master's
valuation.   In order to obviate this, the statute, reciting
'that it is necessary to prohibit the payment, in certain
trades, of wages in goods, or otherwise than in the
current coin of the realm,' by section 1, enacts, that any
contract by which the whole or any part of the wages
of the artificer is made payable in any other manner
than in the current coin shall be null and void."
KEATING, J., in *Archer v. James* (1862), 2 Best & S.
73.

"The old truck enactments are very numerous and
date from about the year 1464 (4 Edw. IV).   They
were applied first to one branch of manufacture, and
then in succession to others as experience and the
progress of manufactures dictated, till they embraced
the whole, or nearly the whole, of the manufactures of
England.   They established the obligation and pro-
duced, or at least fortified the custom, of uniformly
paying the whole wages of artificers in the current
coin of the realm.   They were finally collected and
consolidated into one Act by the statute now under
consideration (1 & 2 Wm. IV. ch. 37).   They were in
truth part of a system of legislation regulating the rela-
tion of master and workman, this part of it being in
favor of the workman, who, as an individual, was
deemed weaker than his master, and therefore liable to
oppression.   *   *   *   The truck act when passed was
a practical deduction from a principle, still more gen-
eral, pervading more or less all systems of law founded
on experience;  that is to say, that where two classes of
persons are dealing together and one class is, generally

The State v. Loomis.

speaking, weaker than the other and liable to oppression, either from natural or accidental causes, the law should, as far as possible, redress the inequality by protecting the weak against the strong.   On this principle rests the protection thrown around infants and persons of unsound or weak mind, the protection afforded even by the common law to the victims of fraud, and by the court of chancery at this day to heirs, expectants and sellers of reversions against catching and unconscionable bargains, though entered into without fraud, and by persons of full age.   No doubt all such legislation or judicial interposition is in many cases ineffectual. *   *   *   The efficacy of such provisions must not be estimated by the abuses actually remedied so much as by the abuses prevented by the knowledge that such is the law.   So viewed, the truck act must have been deemed by the legislature which passed it a highly remedial statute, and is therefore now, as I admit, notwithstanding the penal clauses, to be construed liberally, so as to advance the supposed remedy and suppress the supposed mischief." Byles, J., in *Archer v. James* (1862), 2 Best & S. 82.

Some of the bargains referred to by that learned judge, as well as a great variety of other agreements, have been nullified by courts in this country as well as in England without the aid of statutes, on the ground that they were contrary to public policy (Greenhood on "Public Policy"), while judges possessing equity jurisdiction have for ages exercised, unquestioned, the power to declare agreements void between attorney and client, or between other persons occupying confidential relationships, where advantage was taken of the confidence to secure a bargain which the court considered unduly favorable to the dominant party thereto.

In "*The Juliana*" (1822), 2 Dod. 504, Lord Stowell refused to enforce a covenant between a mariner and

his employer to the effect that the former should not be entitled to any part of his wages unless the ship should return to the last port of discharge. The decision is placed on the ground that, in view of the relative situation of the parties and the nature of the agreement, its effect was oppressive, and not enforcable in a court governed by the "rules of natural justice."

So that at common law, in equity and in admiralty the judiciary exercise the right to annul certain agreements because unfair and unconscionable, the principle of such rulings being that, in some circumstances, real contractual equality, or that entire freedom of action essential to the legal idea of a contract, is wanting.

It seems unreasonable to hold that the courts alone may determine what the public policy of a state shall be respecting the validity of agreements between parties situated so that one may have an undue advantage over the other. Why has not the legislature power by general law operating on future dealings to declare a similar public policy?

The judgments of the courts above mentioned have never been considered an arbitrary infringement of the liberty of contract, nor should a statute, aimed at a system affording the opportunity for oppression described by the English judges quoted, be so considered.

Liberty "on its positive side denotes the fulness of individual existence; on its negative side it denotes the necessary restraint on all which is needed to promote the greatest possible amount of liberty for each." (Amos, Science of Law, p. 90).

Rational freedom is not a license to oppress.

"As soon as any part of a person's conduct affects prejudicially the interests of others, society has jurisdiction over it." Mill on Liberty, ch. 4.

In our country the people have furnished a philosophic, as well as noble, manifestation of the true spirit of liberty, in those guaranties of individual and personal rights of the minority, by which the majority have imposed certain constitutional bounds to their own public action. They stand as barriers to encroachments upon the liberties so protected, but none of them purports to confer or secure absolute freedom of contract. Neither the state nor federal constitution so declares. Laws impairing the obligation of contracts are forbidden; but the interdiction stops at that. In *Canada Railroad Co. v. Gebhard* (1883), 109 U. S. 527, the United States supreme court held that but for that provision of the fundamental law the obligation of contracts was subject to legislative control, and was not secured by any general principles of jurisprudence outside the constitutional guaranty.

The right to regulate contracts so as to mitigate the oppression of the truck system, without impairing the obligation of any existing agreement, is a part of the police power, "which is but another name for that authority which resides in every sovereignty to pass all laws for the internal regulation and government of the state, necessary for the public welfare." *People v. Budd* (1889), 117 N. Y. 14; the *License Cases* (1847), 5 How. 583.

By the constitution of Missouri it is declared that "the exercise of the police power of the state shall never be abridged, or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals, or the general well-being of the state." Constitution, 1875, art. 12, sec. 5.

The police power in recent years has been applied, in many notable instances, where it was resisted on the ground that the liberty of making contracts was not subject to limitation by the legislative power; but the

courts of last resort have ruled against that contention in the granger cases *(Munn v. Illinois* (1876), 94 U. S. 113), in the bread cases, *(Mayor v. Yuille* (1841), 3 Ala. 137; *People v. Wagner* (1891), 86 Mich. 594), and in the elevator cases, *(People v. Budd* (1889), 117 N.Y. 14; *Budd v. New York* (1892), 143 U. S. 517; *State ex rel. v. Brass* (1892), 2 N. D. 482).

In *Water Works v. Schottler* (1884), 110 U. S. 347, it was said that government had power to regulate the prices at which water should be sold by one enjoying a virtual monopoly of the sale.

These decisions show that the right of self-preservation, which exists in the commonwealth no less than in the individual, may, in some circumstances, justify limitations upon the theoretical freedom of contract; and that when, for any reason (for instance, the existence of a monopoly), real liberty of action is wanting on the side of one of the parties, in dealings forming part of the activities of civilized society, a reasonable check may justly be placed by law upon the power of the other to oppress his fellow-citizen.

Such checks upon liberty of contract have been sustained by the highest courts. Others involving the application of the same police power (though in less exigent circumstances) have been long in force in Missouri in many statutes, among which are especially noteworthy the laws fixing a maximum rate of interest for the use of money (Revised Statutes, 1889, sec. 5972), giving mechanics a lien in certain circumstances, *(Henry & Coatsworth Co. v. Evans* (1889), 97 Mo. 47), governing the liability of common carriers, (Revised Statutes, 1889, sec. 944), forbidding contracts to limit the time for bringing any action, (Revised Statutes, sec. 2394), putting into insurance contracts statutory terms, and nullifying "any stipulation in the policy to the contrary," (Revised Statutes, sec. 5856,

enforced by the United States supreme court in *Society v. Clements* (1891), 140 U. S. 226), and the laws establishing standards of weights and measures. Revised Statutes, 1889, c. 170.

The enactment before us comes very near to the class last named. Examining its terms (section 7058) closely, it will be observed that it merely impresses upon contracts for the payment of wages with goods, etc., certain statutory conditions, intended to give the employe an option to demand payment in cash or goods, as his interest may appear to require. As the employer fixes the price of the goods, he is not prejudiced by such a regulation. Its effect is to establish a just standard of value for every dollar due for wages. It does not differ in principle from governmental regulations in the form of laws by which a person who has contracted to receive a yard of cloth or a bushel of corn is protected against the necessity of accepting such a short yard or light bushel as the seller may choose to impose upon him. Statutes designed to prevent that sort of overreaching have been universally regarded as proper exertions of the police power. *Charleston v. Rogers* (1823), 2 McCord, 495; *Stokes v. New York* (1835), 14 Wend. 87; *Green v. Moffett* (1856), 22 Mo. 529; *Yates v. Milwaukee* (1860), 12 Wis. 673; *Eaton v. Kegan* (1874), 114 Mass. 433.

In view of the onerous bearing of the truck system upon some of those whom it affects, in compelling them to accept payment for labor in articles whose value is determined by the party adversely interested in the bargain, this statute (which seeks to relieve against that hardship) should be held (no less than those already mentioned) "due process of law."

Adam Smith, the great advocate of freedom of commerce, declared such legislation "perfectly just and equitable." Wealth of Nations, c. 10, approv-

ingly quoted by BRAMWELL, J., in *Archer v. James* (1862), 2 Best & S. 89.

Whether or not that view is sound it is not our province to determine, for all question of the policy, wisdom or expediency of the law belongs to other departments not to the judiciary. The people in the exercise of the prerogative of self-government have thought proper to establish a rule of conduct on the subject which appeared to them conducive towards maintaining the equilibrium of right and duty between citizens whose common welfare was important to the state. No express command of the constitution forbade such action, and in my judgment it should be sustained.

3. In his opinion the learned chief justice adopts a quotation to the effect that an act of the legislature may "transcend the due bounds of legislative power, even though no express constitutional provision could be pointed out with which it would come in conflict."

That view of the extent of the revisory power of the supreme court over acts of the general assembly has not previously prevailed in Missouri. It is in conflict with several precedents.

In *County Court v. Griswold* (1874), 58 Mo. 192, it was declared: "That the law is unjust, or impolitic, or oppressive, will not authorize a court to declare it illegal, unless it violates some specific provision of the constitution. * * * A law may be unjust in its operation, or even in the principles upon which it was founded; but that would not justify a court in expanding the prohibitions in the constitution beyond their natural and original meaning, in order to remedy an evil in any particular case. These principles have now become axiomatic."

To the same purport is *Hamilton v. County Court* (1851), 15 Mo. 3.

Each of these decisions was given under a constitution containing language the same as that now in force concerning "due process." Afterwards that language was repeated in the present constitution; hence that construction of the language, according to a recognized rule of interpretation, should be taken to have been adopted with it when the new constitution went into force in 1875. *Gas Co. v. Higby* (1890), 134 Ill. 557; *People v. O'Brien* (1892), 96 Cal. 171. The latter instrument, as though to give emphasis to that construction provides that the legislative power is vested in the General Assembly, "subject to the limitations herein contained." Constitution, 1875, article 4, sec. 1. See also the lator case of *Phillips v. Railroad* (1885), 86 Mo. 540.

The spirit and intent of terms used in the constitution are no doubt as much a part of it as its letter, and should be considered in its interpretation. But that is a rule essentially different from the proposition that a statute may be pronounced void because it appears to some court to be in conflict with the supposed general spirit or principles of free government, not expressed in any particular provision of the constitution. To that proposition, or any approach towards declaring it, my dissent is earnestly entered.

The authority of the court is drawn from the organic law which asserts the independence of the three departments of government (Constitution, 1875, article 3), and the power of each is marked by the terms of that instrument.

It has heretofore been considered settled that all action of the legislative department comes within range of the presumption that public officers have rightly acted until the contrary is made clearly to appear; consequently that "a party who wishes us to pronounce a law unconstitutional takes upon himself the burden of

proving beyond a doubt that it is so." *State v. Adding-ton* (1882), 77 Mo. 110; *State ex rel. v. Laughlin* (1881), 75 Mo. 147. But now a majority of the court sanctions the idea that some legislation is not to be considered as *prima facie* constitutional, but calls for a showing of "specific authority" to sustain it.

Such a doctrine (reversing the presumption of the validity of statutes), coupled with the other proposition already discussed in this paragraph, subjecting every act of the general assembly to the hazard of being declared void, "though no express constitutional provisions could be pointed out with which it would come in conflict," furnishes a very interesting formula to determine the constitutionality of legislation, but one quite different from that defined in former precedents in this state. It amounts in substance to a declaration that statutes which seem to the court unjust or unreasonable are not "due process of law," though not otherwise distinctly forbidden by the constitution.

To catch the full force of this ruling it will be well to recall that the guaranty of "due process" is now a part of the fourteenth amendment to the federal constitution as well as of our own organic law; so that the test of the validity of Missouri legislation is to be whether or not it conforms to the standard of reasonableness, indicated by the chief justice, as applied by the federal courts as well as by our own. It would greatly prolong this opinion to point out the far-reaching consequences of adopting such a standard, and its wide divergence from the principles of republican government through co-ordinate departments as established by our written constitutions. It is enough now to assert a dissent to those views of the organic law, as well as to the judgment in this case to which they have led.

4. Some decisions elsewhere have been cited to sustain the conclusion of my colleagues.

The Pennsylvania case should be read along with the later one, in which it was held that the legislature might, under the police power, interfere with freedom of contract to the extent of forbidding totally the sale of an article of food, even though pure and wholesome. *Powell v. Commonwealth* (1886), 114 Pa. St. 265. Judge GORDON, who wrote the former decision, dissented from the latter; but it was affirmed (1888) by the United States supreme court, 127 U. S. 678.

In a yet later unamimous opinion in that state, a statute was held valid prohibiting citizens from assigning certain claims against others, for the purpose of suit in another state. *Sweeney v. Hunter* (1891), 145 Pa. St. 363.

The West Virginia case cited by the chief justice has been much limited, if not overruled, by *State v. Coal Co.* (1892), 36 W. Va. 802, and the Massachusetts decision was by a divided court.

The cases in Illinois are placed chiefly on the ground that it is unconstitutional to establish rules to govern mining and manufacturing concerns different from those which regulate other legitimate enterprises. To that contention the remarks in the first paragraph above are intended to apply. Moreover, the legislation considered in that state differs in important particulars from that here in view.

On the other side, *Hancock v. Yaden* (1890), 121 Ind. 366 supports the position taken in this opinion.

In *State v. Mfg. Co.* (R. I. 1892), 17 L. R. A. 856, a law requiring the payment of wages weekly was held valid; and the principles declared in the decisions sustaining statutes prohibiting the manufacture and sale of oleomargarine are wholly inconsistent with the judgment of the majority of the court in the case at

bar. *State v. Addington* (1882), 12 Mo. App. 214; affirmed (1882), 77 Mo. 110; *Powell v. Pennsylvania*, (1888), 127 U. S. 678; *Butler v. Chambers* (1886), 36 Minn. 69.

5. It has been suggested, in the main opinion as well as at the bar, that the statute in question is subject to criticism as being an exhibition of paternalism in government. To this it may properly be answered that that consideration affects only the policy of the statute and not the constitutional power of the legislature to enact it.

Students of juridical history are aware that governmental interferences with liberty of contract between man and man are less frequent now than in earlier epochs of the English law. Spencer, "Justice," ch. 15, sec. 70; Mayne, Ancient Law [3 Am. Ed.] ch. 9, p. 295. But the power to interfere when necessary to prevent oppression is an important prerogative of sovereignty, and resides in the people of this state, subject only to the limitations expressed in their constitution.

The cure for paternal legislation is not to be found in an assumption by the courts of any part of the power of self-government belonging to the people or their representatives.

To borrow the words of Mr. Justice HARLAN in the United States supreme court, referring to the oleomargarine law:

"If all that can be said of this legislation is that it is unwise, or unnecessarily oppressive to those manufacturing or selling wholesome oleomargarine as an article of food, their appeal must be to the legislature, or to the ballot box, not to the judiciary. The latter cannot interfere without usurping powers committed to another department of government." *Powell v. Pennsylvania* (1888), 127 U. S. 686.

When the present case was in the second division of the court, an able opinion was rendered by Judge THOMAS, *State v. Loomis* (1892), 20 S. W. Rep. 332, affirming the judgment of Judge ELLISON on the circuit. The result then announced appears to me correct.