THE STATE v. ADDINGTON, *Appellant.*

1. **Oleomargarine**: CONSTITUTIONAL LAW. The act prohibiting the manufacture or sale of oleomargarine or any other article in imitation of butter or cheese, is constitutional. Acts 1881, p. 120.

2. **Inter-State Commerce**: CONSTITUTIONAL LAW. State enactments which have the effect of regulating commerce between the states are not obnoxious to that provision of the constitution of the United States which declares that "Congress shall have power to regulate commerce with foreign nations and among the several states and with the Indian tribes," unless they conflict with regulations on the same subject prescribed by congress.

3. **Constitutional Law**: POLICE POWER. Defendant being prosecuted under the act prohibiting the manufacture and sale of oleomargarine, by way of establishing his point that the act was not a proper exercise of the police power, and was, therefore, unconstitutional, offered to show that oleomargarine was wholesome as an article of food. *Held*, that this offer was properly rejected. The constitutionality of the act could not be tested in that way.

4. ———: ACTS OF THE LEGISLATURE ARE PRIMA FACIE VALID. Though the State cannot under the guise of the police power overthrow the rights which the constitution guarantees, yet the legislature may do many things in the legitimate exercise of that and other powers, which, however injudicious they may be, are not obnoxious to the objection of being beyond the scope of legislative power. In all cases the courts presume that acts of the legislature are constitutional. The burden is upon him who alleges the contrary to prove it beyond a doubt.

*Appeal from St. Louis Court of Appeals.*

AFFIRMED.

Defendant was prosecuted for selling oleaginous substances known as "oleomargarine" or "suine," in violation of the act of March 24th, 1881. The act is entitled "An act to prevent the manufacture and sale of oleaginous substances, or compounds of the same, in imitation of the pure dairy products," and provides that "whoever manufactures, out of any oleaginous substances, or any compounds of the same, other than that produced from unadulterated milk or cream from the same, any article designed to take

the place of butter or cheese, produced from pure, unadulterated milk or cream of the same; or whoever shall sell or offer for sale, the same as an article of food, shall, on conviction thereof, be confined in the county jail not exceeding one year, or fined not exceeding $1,000. or both." Acts 1881, p. 120.

On the trial it was agreed that defendant sold to the prosecuting witness in the city of St. Louis, on the 1st day of November, 1881, one original package of an oleaginous substance or compound other than that produced from unadulterated milk or cream from the same, bearing a general resemblance to butter, and sold as an article of food; that said package was sold as "suine" or "oleomargarine," and was branded as such; that there was no pretense that the same was butter; that "suine" is known to the trade to be substantially the same thing as "oleomargarine," and is produced by the same process; that said article was manufactured in the state of Illinois and shipped to defendant in this city.

The defendant offered the testimony of a chemical expert to the effect that he had made a comparative analysis of the article sold with pure dairy butter; that the product sold is in all respects as healthful and nutritious as pure butter, and is not more liable to adulteration or deception; that it will keep as well as pure butter, and, from a sanitary point of view, is in all respects as harmless and desirable a commodity as pure butter. This testimony was excluded by the court on the ground that it was incompetent and immaterial, and defendant excepted. Defendant was convicted and appealed.

*Lyne S. Metcalfe, Jr.,* and *Franklin Ferriss* for appellant.

The title of the act does not purport to be a police regulation. The legislature makes no such claim. Laws of this character are generally entitled acts to protect pub-

lic health, morals, etc.   It is for the court to say whether
the legislature has exceeded its police power.   To hold that
the legislature may determine what is the limit of its police
power is to remove all limit to legislation and all protection
from the citizen, and in this respect a police regulation
ostensibly for the protection of the public, stands on no
better footing than an unqualified arbitrary enactment.
The specious pretense of a police regulation may be used
to cover an arbitrary system of legislation utterly destruc-
tive to private rights, and the plainest limitations of the
constitution thereby removed; because there is no private
right, even that to life and liberty, but must be surrendered
if the public good demands it.   The constitution must be
inoperative, unless some power resides outside the legisla-
ture to hold it in obedience to the constitution, and this
must be as true of police regulations as of other laws.   The
courts have not failed to recognize this doctrine.   The
court will not sanction an unreasonable exercise of the
power to make police regulations.   *State v. Fisher*, 52 Mo.
174; *County Ct. of St. Louis Co. v. Griswold*, 58 Mo. 193.
If the legislature prohibits that which is harmless in itself,
it would be an unauthorized exercise of power, and it
would be the duty of the court to declare such legislation
void.   *T. W. & W. R. R. Co. v. Jacksonville*, 67 Ill. 37; *Peo-
ple v. P. R. Co.*, 9 Mich. 309; *Lakeview v. Rose Hill Cem.
Co.*, 70 Ill. 191; *Munn v. People*, 69 Ill. 80; *Yeazel v. Alex-
ander*, 58 Ill. 254; *Railroad Co. v. Husen*, 95 U. S. 473.
Neither can the legislature assume a police power by de-
claring the thing sought to be prohibited a nuisance.   *Beebe
v. State*, 6 Ind. 514.

 We do not question the power of the legislature to
prevent the adulteration of food, or deception of any kind
in its preparation.   Any law which compels those who
deal in artificial butter to brand it as such, or which makes
it a misdemeanor to sell it as the genuine article, will be
proper, and, we assert, effective; but we do object to a law
which positively forbids the manufacture and sale of an

article which from its description in the statute does not
appear to be injurious, and which we offer to prove is a
positive benefit to the State.

This is not a question of regulation but of prohibition,
and such prohibition can be justified if at all on one of
two grounds.    First, that the article is of such a nature
that deception and fraud must inevitably result from its
use to the injury of the health or morals of the commu-
nity.    Or secondly, that there exists in the community a
prejudice against the use of this article, which prejudice
the legislature and courts are bound to respect.

The first argument assumes that the article is injuri-
ous and that its use even knowingly would be injurious.
This we deny, and offer to prove the contrary, and it is
practically conceded both by the respondent and court be-
low that such is not the fact.    The tendency to deception
is no greater than it is in numerous articles of daily con-
sumption.    Who will claim that the legislature can guard
against every species of deception?    The constitutional
grant of life, liberty and fruits of industry must necessarily
result in some danger to other members of the social body.
No power on earth can secure the fullest measure of indi-
vidual liberty and at the same time perfect immunity from
danger.

If this artificial article is in its use injurious to public
health, it must be far different from the genuine article in
its constituents and effects, and can be detected by experts
and guarded against by inspection laws.    If it is so similar
in appearance, taste, smell and constituent elements that
the difference cannot be detected, the deception cannot be
a very dangerous one,

The second argument seems to be the one on which
the court below rests its opinion.    In the first place there
is no proof of the fact that a prejudice exists, and we con-
tend that the court cannot assume judicial knowledge of
such fact even if it does exist.    Further, we say that an
act of the legislature prohibiting the manufacture and sale

8—77

of an article cannot be justified upon the sole ground that a prejudice exists against it, especially in view of the fact that the article is healthful and uninjurious, and such a prejudice is, therefore, unreasonable, and results from ignorance. Artificial butter, which by this act is prohibited, is as wholesome and uninjurious as dairy butter. Both are composed of the same elements in slightly varying proportions, and both mainly composed of pure animal fat. The artificial butter is as healthy and nutritious as dairy butter, is no more liable to adulteration or deception, and is in all respects as harmless and desirable an article. There is no question but that this process of making butter from pure animal fat is one of the greatest discoveries of the age. By the application of science the cost of producing an article of food is greatly lessened, and this article is one of universal use and necessity. The secret is simply this : both dairy butter and artificial butter are composed in the main of pure fat, which undergoes no chemical change in the butter process. In the one case the fat from the animal passes into the milk at the natural temperature of the body in small globules which afterwards rise to the surface forming the cream which is churned into butter. In the other case the proper butter fat is separated by a scientific process from the natural fat into oleo oil, which, like the cream, is churned into butter, the change in both cases being mechanical and not chemical; and thus it appears that both products are substantially the same. See offer of proof; see also Encyclopædia Britannica, Title "Butter ;"Johnson's Universal Cyclopædia, same title. See also the Scientific American, supplement No. 322, March 4th, 1882, page 5153. These authorities show that the making of the article sought to be prohibited is a valuable industry and not an evil, which requires the interposition of the police powers of the legislature.

The act is unconstitutional because it interferes with inter-state commerce, by not distinguishing between articles manufactured in this State and those imported. *Brown*

*v. Maryland,* 12 Wheat. 439 ; *Railroad Co. v. Husen,* 95 U. S. 473.

*D. H. McIntyre,* Attorney General, for the State.

1   The evidence offered by defendant was properly excluded.  By the agreed statement of facts the defendant was guilty of a violation of the law, and if the act was constitutional, was liable to the penalty it imposed.   The evidence offered did not go to prove the act unconstitutional, and was, therefore, incompetent and immaterial to the issues on trial.   It would have been very proper evidence to lay before the legislature while deliberating upon the passage of the act, but was not pertinent to the inquiry into defendant's guilt or innocence upon the charge.

2.   This act is but the reasonable exercise of the police power of the State.   It has always been conceded that the State has the right to make and enforce laws regarding the adulteration of articles of food, and this act comes under that class of laws.   It makes no difference that it may be the testimony of experts that the oleaginous substances against which this act is directed are palatable and wholesome as articles of food.   While such may be the case, the manufacture of such compounds from deleterious substances is liable to be engaged in to a great extent, and the close resemblance of these substances to genuine butter renders it easy for dealers in such to impose upon persons by selling to purchasers the spurious for the real article.   These facts taken in connection with the almost universal prejudice against the use of these compounds, make their manufacture and sale within this State injurious to the general comfort, if not the health of its citizens, and, therefore, the fit subject of police regulations, even to the entire prohibition of their manufacture and sale. *Thorpe v. R. R. Co.,* 27 Vt. 149.

3.   Whether the law is satisfactory or not, is a matter addressed exclusively to the wisdom of the legislature.   It

may not only prohibit the manufacture of these substances, but may prohibit the sale of those on hand at the time of the passage of the act, and not thereby render the act obnoxious to any constitutional provision. Cooley Const. Lim., (3 Ed.) 581, 582, 583.

SHERWOOD, J.—The opinion of the St. Louis court of appeals, per Thompson, J., so thoroughly and ably considers the subject presented by this record, that we might well forbear doing more than to give that opinion our entire approval. We have thought best, however, to offer one or two additional suggestions which we deem pertinent.

## I.

And first as to the objection that the statute is unconstitutional because violative of the provision of the constitution of the United States that "The congress shall have power to regulate commerce with foreign nations and among the several states and with the Indian tribes." To this objection, in addition to the reasons so well urged on this point by the court of appeals, may be mentioned this one: That it does not appear that congress has passed any law to regulate commerce in "oleomargarine" or "suine" between the states, and of consequence the act under discussion cannot be obnoxious to the charge of being in contravention of that provision of the constitution of the United States relied on by the defendant; even if the act, on which the indictment is bottomed, be regarded as one which has the effect of regulating commerce between the states. Such regulations by the states are valid in so far as concerns the constitutional provision we have quoted, except when conflicting with regulations on the same subject prescribed by congress. *License Cases*, 5 How. 504; Cooley Const. Lim., 581 *et seq.*, and cases cited.

## II.

Relative to the offer of defendant to prove that the

article he sold was wholesome as an article of food, the testimony, as adjudged by the trial court, was wholly irrelevant. The position of the defendant in substance is, that if the wholesomeness of the article as one of food, could be established, that thereby the constitutionality of the act which forbids its sale would be overthrown. This is clearly a *non sequitur*. Such a position, if pushed to its logical conclusion, would utterly overthrow the exercise of the police power by the State; overthrow every law the wisdom of which could not bear the test of scrutiny. Proceeding on such a theory, a man arrested for killing game at an unlawful season, might appropriately offer to prove that the birds killed were injurious to the public or were destructive to crops. Or, made to submit to sanitary regulations, might claim that there was no disease on board his ship, and, therefore, the law which compelled him to remain at quarantine, was an arbitrary infringement of his constitutional rights.

We may make the broad concession that a state cannot, under the disguise of the police power, overthrow the rights which the constitution guarantees; but notwithstanding this, it cannot be gainsaid that the legislature may do many things in the legitimate exercise of that and other powers, which, however unwise or injudicious they may be, are not obnoxious to the objection of being beyond the scope of legislative authority. It would be exceedingly difficult, if not impossible, to state, beforehand, what, in a number of cases, should be regarded as an assumption by the legislature of powers not warranted by the constitution. Each case, to a certain extent, must be determined by its own circumstances, the court, in every instance, regarding the act to be investigated as *prima facie* constitutional. "The right of the judiciary to declare a statute void and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave, that it is never to be exercised except in very clear cases; one department of the government is bound to presume

that another has acted rightly. The party who wishes us to pronounce a law unconstitutional takes upon himself the burden of proving beyond doubt that it is so." *Erie & N. E. R. R. Co. v. Casey,* 26 Pa. St. 287.

The central idea of the statute before us seems very manifest; it was, in our opinion, the prevention of facilities for selling or manufacturing a spurious article of butter, resembling the genuine article so closely in its external appearance, as to render it easy to deceive purchasers into buying that which they would not buy but for the deception. The history of legislation on this subject, as well as the phraseology of the act itself, very strongly tend to confirm this view. If this was the purpose of the enactment now under discussion, we discover nothing in its provisions which enables us, in the light of the authorities, to say that the legislature, when passing the act, exceeded the power confided to that department of the government; and unless we can say this, we cannot hold the act as being anything less than valid.

For these reasons, as well as for those stated by the court of appeals, we affirm the judgment. All concur, except HOUGH, C. J., who is of opinion that the judgment of the court of appeals should be reversed.