State v. Layton.

---

## THE STATE v. LAYTON Appellant.

### Division Two, February 26, 1901.

1. **Alum Baking Powder: CONSTITUTIONAL STATUTE.** The Act of March 11, 1899, making it "unlawful for any person or corporation doing business in this State to manufacture, sell or offer to sell, any article, compound or preparation, for the purpose of being used, or which is intended to be used, in the preparation of food, in which article, compound or preparation, there is any arsenic, calomel, bismuth, ammonia, or alum," is not unconstitutional, although the evident design of such act was to suppress a baking powder admitted to be in general use, but whose wholesomeness or unhealthfulness, notwithstanding its general use, is in sharp and forceful dispute.

2. **Invading Rights of Citizen: TEST.** When the constitutionality of an act of the Legislature is assailed as invading the right of the citizen to use his faculties in the production of an article for sale for food or drink, the test is this: if it be an article so universally conceded to be wholesome and innocuous that the court may take judicial notice of that fact, the Legislature, under the Constitution, has no right to prohibit it; but if there is a dispute as to the fact of its wholesomeness for food or drink, then the Legislature can either regulate or prohibit it. And this test is made necessary by the rule of construction adopted by the American courts, to-wit: "An act of the Legislature is not to be declared void, unless the violation of the Constitution is so manifest as to leave no room for reasonable doubt."

Appeal from St. Louis Court of Criminal Correction.—*Hon. Willis H. Clark,* Judge.

AFFIRMED.

State v. Layton.

*Seddon & Blair* and *Stanley Stoner* for appellant.

(1) The act in question conflicts with the provision of section 28, article 4,· Constitution of Missouri, which provides that no bill "shall contain more than one subject which shall be clearly expressed." Kansas v. Payne, 71 Mo. 159; State v. Burgdoerfer, 107 Mo. 1.   (2) The Bill of Rights (section 4) provides "that all persons have a natural right to life, liberty and the enjoyment and the gains of their own industry, and that to give security to these is the principal office of government." And section 30, Bill of Rights, provides "that no one shall be deprived of life, liberty or property without due process of law." Under these provisions the defendant Layton, as every other citizen of Missouri, has the equal right that every other citizen has of assuming his ordinary calling or trade in any wholesome and well established article of commerce, and as the law under which he is convicted forbids him to pursue such a calling, it is unconstitutional and void. 2 Hare on Constitutional Law, p. 772; Railroad v. City, 67 Ill. 37; Mugler v. Kansas, 123 U. S. 661; Taylor v. Bronson, 4 Hill, 144; In re Jacobs, 98 N. Y. 98; People v. Marx, 99 N. Y. 377; People v. Arensberg, 105 N. Y. 123.   The ·following are differentiated and discussed: Powell v. Commonwealth, 127 U. S. 678; State v. Addington, 77 Mo. 110.   (3) The evidence offered by the defendant and ruled out by the court, brought to the attention of the court the fact that the trade in which the defendant was engaged was a lawful business, being the manufacturing and selling of a well-recognized article of commerce of almost universal acceptance after a test of more than twenty-five years of experience.   This fact was a matter of common notoriety of which the court should have taken judicial cognizance.   The fact that some people engaged in the business may or do com-

mit frauds or by their want of skill or dishonesty injure others, does not render the business unlawful. Tiedeman on Constitutional Law, p. 289. (4) The law under which the defendant was convicted conflicts with the fourteenth amendment of the Constitution of the United States, which guarantees to every man the equal protection of the law. State ex rel. Wyatt v. Ashbrook, 55 S. W. 627.

*Edward C. Crow,* Attorney-General, *Sam B. Jeffries,* Assistant Attorney-General, and *Stewart, Cunningham & Eliot,* for the State.

(1) The act in question conforms to the requirement of section 28, article 4, of the Constitution. The bill contained no more than one subject, and that subject is clearly expressed in the title. State v. Bennett, 102 Mo. 364; State v. Burgdoerfer, 107 Mo. 1; State ex rel. v. Bronson, 115 Mo. 276; State ex rel. v. Jackson County Court, 102 Mo. 537; State ex rel. v. Marion County Court, 128 Mo. 441; State v. Bockstruck, 136 Mo. 353; Hannibal v. Marion County, 69 Mo. 571; State ex rel. v. Ranson, 73 Mo. 78; State ex rel. v. Miller, 100 Mo. 439; Lynch v. Murphy, 119 Mo. 163. (2) The statute here in controversy does not contravene section 4 of the Bill of Rights. It does not deny or impair the right of appellant or of any person to "life, liberty or the enjoyment of the gains of their own industry," within the meaning of that section. Neither does this statute violate section 30, article 2, of the Constitution. It does not deprive appellant or any person "of life, liberty or property without due process of law," within the meaning of that section. Neither section 4, nor section 30, of article 2, nor any other provision of the Constitution guarantees or gives to defendant the right to manufacture or sell for food, alum or any chemical or substance which

State v. Layton.

the Legislature has declared to be unhealthy and forbidden. Appellant has no such constitutional right, even though he may, before the statute was enacted, have been engaged in the business of such manufacture and sale.    State v. Addington, 77 Mo. 110, affirming same case, 12 Mo. App. 214; State v. Bockstruck, 136 Mo. 335; Mugler v. Kansas, 123 U. S. 623; Powell v. Pennsylvania, 127 U. S. 678; Powell v. Commonwealth, 114 Pa. St. 265; Beer Co. v. Massachusetts, 97 U. S. 25; Commonwealth v. Alger, 7 Cush. 53; Fertilizing Co. v. Hyde Park, 97 U. S. 667; Boyd v. Alabama, 94 U. S. 645. (3)    The trial court did not err in refusing to take judicial cognizance of the alleged fact that the trade of making and selling alum baking powders, in which defendant was engaged, was a lawful business; or that alum baking powder is a well-recognized article of commerce of almost universal acceptance.    No such fact is a matter of common knowledge or of universal or even general acceptance.    Neither did the court err in excluding evidence tending to prove such facts. The Legislature must be assumed to have considered all such evidence, and having decided *contra,* its decision is conclusive upon all such questions.    Cooley Const. Lim. (5 Ed.), pp. 222, 223; State v. Rich. 20 Mo. 397; State v. Wiley, 109 Mo. 444; Ex parte Renfrow, 112 Mo. 595; State v. Daniels, 66 Mo. 202; State ex rel. v. Boone County Court, 50 Mo. 323; State v. Addington, 77 Mo. 110; s. c., 12 Mo. App. 214; State v. Campbell, 64 N. H. 402; United States v. Des Moines, etc., 142 U. S. 545; People v. Chipperly, 101 N. Y. 634; s. c., 37 Hun., 324.    (4) The statute in question does not conflict with the fourteenth amendment of the Constitution of the United States.    It does not deny to any person the equal protection of the laws; nor does it conflict with any other provision of the Constitution of the United States or of the Constitution of Missouri.    There is in this case no question or subject of

foreign or interstate commerce. Mugler v. Kansas, 123 U. S. 623; Powell v. Pennsylvania, 127 U. S. 678; Plumley v. Massachusetts, 155 U. S. 461; Schollenberger v. Pennsylvania, 171 U. S. 16; Barnett v. Railroad, 68 Mo. 56; State v. Bockstruck, 136 Mo. 335; Butchers' Union, etc., Co. v. Crescent City, etc., 111 U. S. 750. (5) The subject of this legislation, the public health, and the prevention of the adulteration of food, is peculiarly within the power and protection of the Legislature. So long as the Legislature does not clearly exceed constitutional limitation its fiat on that subject is law, however unwise, unjust or hurtful its enactments may seem to the courts and the people. The enactment of the statute under consideration was a valid exercise of the police power of the State conferred by the Constitution upon the Legislature. 18 Am. and Eng. Ency. of Law (1 Ed.), p. 748, title, "Police Power;" Idem (2 Ed.), vol. 1, p. 739 et seq., title, "Adulteration;" Commonwealth v. Huntley, 156 Mass. 236; State v. Smyth, 14 R. I. 100; State v. Campbell, 64 N. H. 402; Commonwealth v. Waite, 11 Allen, 264; Cooley Const. Lim. (5 Ed.), pp. 207, 206; Edwards v. Lesueur, 132 Mo. 430; State ex rel. v. Pond, 93 Mo. 619; Powell v. Pennsylvania, 127 U. S. 684; Powell v. Commonwealth, 114 Pa. St. 292; Thorpe v. Railroad, 27 Vt. 140; State v. Addington, 77 Mo. 110; s. c., 12 Mo. App. 214; Commonwealth v. Alger, 7 Cush. 84.

*Seddon & Blair, Stanley Stoner* and *Winston & Meagher* for appellant in reply.

(1) The title to the act is a deception and a fraud upon the public. The title to the act was apparently drafted with the intent and purpose of deceiving the public and the legislators, in that, from the title we must infer that it was sought to

prevent the use of unhealthy chemicals or·substances in the preparation or manufacture of any article used, or to be used, in the preparation of food, while in the body of the act we find the words "arsenic," "calomel," "bismuth," "ammonia" and "alum," used to designate "unhealthy chemicals or substances." Arsenic, calomel and bismuth are well-known poisons, and are never, as the evidence shows, used in the preparation of food. On the other hand, it appears conclusively from the evidence in this case that for thirty years alum has been used as one of the constituents of baking powder. (2) A statute having for its manifest purpose the protection of the public health, or the prevention of fraud upon the public, is valid. A statute passed merely for the protection and fostering of one branch of an industry by prohibiting another branch of the same industry is invalid. Perhaps in no cases is this distinction better defined than in People v. Marx, 99 N. Y. 377 (2 N. E. 29), and People v. Arensberg, 105 N. Y. 123 (11 N. E. 277). (3) The tests by means of which it may be determined whether a statute exists for the protection of one industry at the expense of another, or is for the prevention of fraud upon the public, or the protection of the public health, depend in the first instance upon the wording of the statute itself. If an inferior article not naturally like another superior article, or one commonly supposed to be superior, is absolutely prohibited, even though it be labeled or identified, so that it can deceive no one as to its true character, then its validity or invalidity will depend upon whether the article prohibited is in general, injurious to the public health. This proposition has been well enunciated by Tiedeman in his work on the Limitations of Police Power, p. 289. The sole ground for the absolutely prohibitory statute to rest upon is that it is necessary for the protection of the public health. If, then, in the case at bar, it had only been proven that the par-

ticular article manufactured and sold by the appellant in this particular case was perfectly wholesome, there might be some force in the argument that the statute should be sustained; because the court, against the will of the Legislature, might not be warranted in saying that, because Layton's baking powder was not deleterious to the public health, all baking powders containing alum were not injurious to the public health. For it might be well argued that the Legislature had passed upon that question and found that the article prohibited was, in the main, unwholesome. But that is not this case. It appears in this record, by almost an avalanche of testimony —testimony given by disinterested witnesses who had abundant opportunity for investigating and knowing the matter about which they testified; testimony of witnesses, expert and lay; testimony of the proprietors of large hotels in Chicago, Kansas City and St. Louis, who had used alum baking powder for years; testimony of boardinghouse keepers, and testimony of working men and working women from the factories, who had breathed and inhaled the dust from alum and alum baking powder of all kinds for years and years, that not only Layton's alum baking powder, but alum baking powders generally, are, and always have been, healthful and wholesome adjuncts in the preparation of human food. There is not a scintilla of evidence, not even a hint or suggestion, in this whole record, that any one ever heard of, much less knew of, a case where the health of a single human being had been injured by the use of alum baking powder in the preparation of food. And yet it appears that alum baking powder has been extensively used for upwards of thirty years, and that the entire output of alum powder in these United States per year is about one hundred and twenty millions of pounds. We, therefore, insist that the Legislature of the State of Missouri, in attempting to prohibit the use of alum in the preparation of food, far

exceeded its constitutional power, and that whatever legal presumption which may have been indulged that the Legislature has found alum unwholesome, is conclusively rebutted, not only by this record, but, to use the language of our distinguished adversary, "by common knowledge—self-evident facts —facts of which the court will take judicial notice; facts about which there is a general, common consensus of all intelligent persons; facts about which there is no dispute or difference of opinion among intelligent persons;" facts which irresistibly appeal to the sober judgment of the court, and to that of every honest, conscientious, thoughtful citizen of the State of Missouri. (4) Does the Missouri statute exist solely for the purpose of protecting and fostering the cream of tartar baking powder industry, by prohibiting absolutely the manufacture or sale of baking powder made with alum, or is its clear purpose and effect the prevention of fraud upon the people of Missouri, or the protection of the public health? By the evidence it is conclusively established that baking powder made with alum is, in general, perfectly wholesome. We, then, have a statute absolutely prohibiting the manufacture or sale of an article not made in "imitation" of any superior article, in no case injurious to the public health, an article well known to commerce, an article used by the people for the last twenty-five years without any deleterious effects whatsoever, an article which we venture to say enters into the food composition of the great majority of the citizens of the State of Missouri.

GANTT, J.—On the thirtieth day of August, 1899, the assistant prosecuting attorney of the St. Louis Court of Criminal correction lodged in that court the following information against Whitney Layton of said city:

"Richard Johnston, assistant prosecuting attorney, of

Vol 160 mo—31

the St. Louis Court of Criminal Correction, now here in court, on behalf of the State of Missouri, information makes as follows:

"That Whitney Layton in the city of St. Louis, on the twenty-eighth day of August, 1899, then and there doing business in this State, did unlawfully manufacture, sell and offer to sell a certain compound and preparation, to-wit, Layton's Health Food Baking Powder, which said compound and preparation was so manufactured and sold for the purpose of being used and was intended by said Layton to be used in the preparation of food, in which said compound and preparation, so manufactured and sold, there was alum. Contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State," etc.

The defendant was arrested and entered his plea of not guilty.

A jury was waived and the cause tried to the court.

At the trial the State's representative filed and read in evidence the following stipulation:

"For the purpose only of the trial of this cause and at said trial the defendant Whitney Layton, for a stipulation covering a part of the facts in the above entitled case, admits that in the city of St. Louis, Missouri, on the twenty-eighth day of August, 1899, he, the defendant, then and there doing business in the State of Missouri, did manufacture, sell and offer to sell to J. M. Houston Grocery Company, then doing business at said city, a certain compound and preparation, to-wit, one case containing two dozen, one-pound cans of baking powder, known and designated as Layton's Health Food Baking Powder, which said compound and preparation, so manufactured, sold and offered for sale by him for the purpose of its being used and was intended by defendant and by said J. M. Houston Grocer Company to be use in the preparation of food.

State v. Layton.

"Defendant further admits that in said compound and preparation so manufactured, sold and offered to be sold by him there was alum, and that the fact that the same contained alum was then well known to defendant; and it is further agreed and stipulated that at the trial of this case either party may offer any other evidence not inconsistent with the above facts which he may deem material, relevant and competent in the case, subject to objection by the other party to its materiality, relevancy or competency."

The prosecution then rested.

The defendant then offered evidence tending to establish the following facts:

Baking powders have been in use for more than fifty years. They are intended to furnish to the people a simple, cheap, efficient, and wholesome leavening agent in the cooking of food, as a substitute for yeast, which is a very slow and more expensive leavening agent, and one which requires considerable intelligence in the cook to use successfully. All baking powders furnish this leavening agent in the form of carbon dioxide (carbonic acid gas), which is given off from the baking powder in preparing and cooking food. This gas being liberated in the dough, forms bubbles which take permanent form in the baked bread, thus making it light and porous. All baking powders in their essential features are the same. They all supply this leavening agent (dioxide of carbon), by freeing it from bicarbonate of soda. They differ in the nonessential manner in which this carbon dioxide is released from the bicarbonate of soda. There are three classes of baking powders known to commerce, viz., the cream of tartar baking powders, the phosphate baking powders and the alum baking powders.

The cream of tartar powders are composed of bicarbonate of soda and cream of tartar (bicarbonate of potassium), mixed

with starch as a filler. The soda and cream of tartar are combined in such proportions that when they are united together in the presence of water, in the process of cooking, they react upon each other, and free the carbon dioxide which leavens the bread. The resulting product left in the bread after cooking is Rochelle Salts, a purgative agent.

In the phosphate powders the active agent is the phosphate of calcium which unites with the bicarbonate of soda and liberates the dioxide of carbon, the leavening agent.

The alum powders, as they do not differ from the cream of tartar powders in the main essential features of a baking powder, to-wit, the liberation of the carbon dioxide from bicarbonate of sodium, but merely in the non-essential mode of liberating the gas, do not differ from each other essentially. In the phosphate alum powders, phosphate of calcium is used to aid in liberating from the bicarbonate of soda the gas, the leavening agent, the essential thing.

The straight alum baking powders are composed of bicarbonate of soda and a double sulphate salt of sodium and aluminum, which technically is not alum at all but is popularly called soda alum, with starch as a filler or carrier. The alum and the bicarbonate of soda are mixed in such proportions that in the cooking process the carbon dioxide is released as a leavening agent, as in the case of the cream of tartar baking powders. The resulting products are sulphate of sodium and hydroxide (hydrate) of aluminum.

The evidence of defendant tended to show that none of the products left in the food cooked with alum baking powders are at all injurious to the human system.

The evidence shows that the trade in alum baking powders as a trade has given entire satisfaction to the people. Alum baking powders are nearly as standard an article as flour or sugar. They are to be found upon the shelves of every gro-

cery store, not only in Missouri but in the United States. They were first introduced about 1870. In spite of the fiercest competition and most hostile rivalry upon the part of manufacturers of cream of tartar powders, who the evidence shows have used every effort to prejudice the mind of the public by every manner of advertisements and representations, the trade rapidly expanded until it has now reached vast proportions. The evidence tended to show that alum baking powder sold in the United States last year amounted to not fewer than 120,-000,000 pounds and involved an enormous expenditure in its manufacture and distribution. The defendant's evidence also tended to show, that not only was the particular case of baking powder known as "Layton's Health Food" for the sale of which he was prosecuted, but also *all alum baking powders in general* are and always have been healthful and wholesome adjuncts in the preparation of human food. The evidence tends to show that no one had ever either heard of, or had known of, a single case where the health of a single human being had been injured, or had been supposed to have been injured by the use of alum baking powder in the preparation of food, and that the trade in alum baking powders, as a trade, prior to the passage of this law, was an honest and lawful business in a generally harmless, and useful preparation used as an adjunct in the cooking of food. The manufacturers and sellers of both such powders, cream of tartar and alum, have been engaged in competition with each other in furnishing to the people from bicarbonate of soda a leavening agent for cooking bread, cake, etc. They differ only in the non-essential manner of freeing the gas. That the trade in cream of tartar powders has been practically monopolized by the Royal Baking Powder Company, which controls the cream of tartar market.

To all of this evidence counsel for the State objected

when it was offered, on the ground that in view of the stipulation made between the parties, which was read by the State in making its case, all evidence which might be offered by the defendant in his defense would be irrelevant and immaterial.

The court at the time of the objection announced it would not then rule upon the objection, but would hear the evidence subject to such objection and would at the end of the case announce its ruling, and if it concluded the objection was well taken would rule out all of such evidence.

On the other hand the State in rebuttal offered much evidence by distinguished chemists and physicians that alum in the quantities usually used in the preparation of baking powders was and is injurious to health; that while it assists in liberating the carbonic acid gas and thus makes the bread light, there is a residuum of alumina left in the bread which is solvable and enters into the system and acts as an astringent and is deleterious; that there was a general prejudice in the minds of the public against alum powders; that while the sale of alum powders was very enormous people generally were not advised that they were purchasing alum powders.

After all the evidence was in, the court sustained the objection of the State and excluded all defendant's evidence as irrelevant and immaterial to the issue in the case. To which the defendant duly excepted at the time.

Every item of the evidence offered by defendant was avowedly introduced for the purpose of showing that the statute under which defendant was prosecuted was unconstitutional and void, which contention the court overruled, and found defendant guilty. The statute which defendant is charged to have violated is the Act of May 11, 1899, and is as follows:

"An Act to Prevent the Use of Unhealthy Chemicals or Substances in the Preparation or Manufacture of any Article Used or to be Used in the Preparation of Food.

*"Be it enacted by the General Assembly of the State of Mis<sub></sub>.
souri as follows:*

"Section 1.   That it shall be unlawful for any person or
corporation doing business in this State to manufacture, sell
or offer to sell, any article, compound or preparation, for the
purpose of being used, or which is intended to be used, in the
preparation of food, in which article, compound or prepara-
tion, there is any arsenic, calomel, bismuth, ammonia or alum.

"Sec. 2.   Any person or corporation violating the provi-
sions of this act shall be deemed guilty of a misdemeanor and
shall, upon conviction, be fined not less than one hundred dol-
lars, which shall be paid into and become a part of the road
fund of the county in which such fine is collected.

"Approved May 11, 1899."

The defendant asked various declarations of law to the
effect that the Legislature could not arbitrarily declare his
business unlawful, which were refused and he saved his ex-
ceptions, and in due time filed his motions for new trial and in
arrest, which were likewise overruled.

As already indicated in the statement of the case, the one
great question upon this record is the constitutionality of the
Act of May 11, 1899, making it a misdemeanor in this State
"for any person or corporation doing business in this State to
manufacture, sell, or offer to sell any article, compound or
preparation for the purpose of being used or which is intended
to be used, in the preparation of food, in which article, com-
pound or preparation there is any . . . . alum."

The act was obviously aimed at what is known as "Alum
Baking Powders."   While the act also condemns the use of
arsenic, calomel, bismuth, and ammonia in baking powders,
there is not the slightest evidence that either of these poisons
or substances is ever used in the preparation of baking pow-
ders in the ordinary trade by reputable dealers and merchants,

whereas the evidence which the court heard, but finally excluded in making up its verdict and judgment, disclosed that alum is and has been for more than a quarter of a century an ingredient in the preparation of baking powders; that baking powders containing alum in some degree are used to an enormous extent; that not less than 120,000,000 pounds of such powders have been sold in the United States in the year next preceding the filing of the information in this case.

The defendant is a manufacturer of a baking powder known as "Layton's Health Food Baking Powder," and after the Act of May 11, 1899, if valid, went into effect, sold a case of said baking powder in the city of St. Louis.

The constitutionality of the act is assailed on two grounds. First, that it violates section 28, article 4, of the Constitution of Missouri;

Second, that it conflicts with sections 4 and 30 of article 2 of the Constitution of Missouri.

It is a trite saying that when the courts are called upon to decide that an act of the Legislature violates the organic law they start with every presumption in favor of the validity of the statute. This much we owe to a co-ordinate branch of the government, upon which the people in the Constitution have conferred the lawmaking power.

The right and power of the courts under our peculiar form of government to declare a solemn and formal act of the Legislature invalid arises not out of any supposed or assumed superiority of the judicial department over that of the legislative branch of the government, but is founded upon the fact that the Constitution is the organic law which defines the limitations of all branches of the government and is the supreme law by which the acts of all branches of the government must be tested and in the very nature of things the judiciary must in performing its functions determine whether the legislative enactment is in harmony with the supreme law.

State v. Layton.

Proceeding a step farther, it must be conceded that the validity of the act in question must be referable to what we denominate the police power of the State, and that the Legislature is clearly the department of the government which is authorized to exercise the police power.

Under forms of government where limitations upon executive and legislative powers do not exist, there is no restriction upon this necessary function of government, but under our Federal and State governments limitations are to be found in our written constitutions.

Said the Supreme Court of the United States in Mugler v. Kansas, 123 U. S. loc. cit. 661: "It does not follow that every statute enacted, ostensibly for the promotion of these ends, is to be accepted as a legitimate exertion of the police powers of the State. There are, of necessity, limits beyond which legislation can not rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute (Sinking Fund Cases, 99 U. S. 700-718), the courts must obey the Constitution rather than the lawmaking department of the government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in Marbury v. Madison, 1 Cranch 137-176, 'are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.' The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the Legislature has

transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

Accepting this statement of the rights and duties of the respective departments, we are brought to the contention of the parties to this record.

The defendant insists that the compound prepared by himself and other manufacturers as and for a baking powder, is a perfectly healthful article, that had been in general, indeed, universal use in this State and throughout the United States for thirty years. That these so-called alum baking powders have proven acceptable as a common household article, as a mose useful adjunct to the cooking process; that during all that time not a single instance had occurred in which a single person had been rendered sick or suffered in health from their use; that they had become so acceptable to the bakers and housewives of the land that their production and sale amounted to 120,000,000 pounds in a single year; that no more objection could be urged against their use as being deleterious than can be and has been urged by vegetarians against the use of meat, or by certain persons against the common table salt or the use of wheat bread, and that it is no more liable to adulteration than flour or sugar. He urges that to strike down this great industry in view of its recognized harmlessness is an arbitrary and unwarranted attempt to exercise the police power of the Legislature.

On the other hand the State insists that section 4 of our Bill of Rights which provides "that all constitutional government is intended to promote the general welfare of the people;.

State v. Layton.

that all persons have a natural right to life, liberty and the enjoyment of the gains of their own industry; that to give security to these things is the principal office of government, and that when government does not confer this security it fails of its chief design," and section 30 of the Bill of Rights which ordains "that no person shall be deprived of life, liberty or property, without due process of law," are not infringed by this act: that "the *Constitution does not guarantee or give to any person the right to manufacture or sell any chemical or substance which the Legislature has declared to be unhealthy and has forbidden.*" The State's counsel further insists that the judgment of the criminal court is in conformity with the decision of this court in State v. Addington, 77 Mo. 110, which case they insist involved every essential feature of the case at bar.

In State v. Addington, supra, the defendant was prosecuted under the statute of this State of March 24, 1881, entitled "An Act to prevent the manufacture and sale of oleaginous substances, or compounds of the same, *in imitation* of the pure dairy products."

In sustaining that statute, this court stated concisely the ground upon which it rests, as follows:

"The central idea of the statute before us seems very manifest; it was, in our opinion, the prevention of facilities for selling or manufacturing a *spurious* article of butter, resembling the genuine article so closely in its external appearance, as to render it easy to deceive purchasers into buying that which they would not buy but for the deception. The history of legislation on this subject, as well as the phraseology of the act itself, very strongly tend to confirm this view. If this was the purpose of that enactment, we discover nothing in its provisions which enables us to say that the Legislature exceeded the power confided to that department of the govern-

ment; and unless we can say this, we can not hold the act as being anything less than valid."

Commenting upon this decision Tiedeman in his work on "Limitations of Police Power," page 296, says: "But the only valid objection to its sale is the close resemblance to genuine butter, and the consequent opportunity for the perpetration of fraud. And this was the sole ground upon which the constitutionality of the law was sustained by the Supreme Court of Missouri."

In State v. Bockstruck, 136 Mo. 356, State v. Addington, supra, was reviewed by the same judge who wrote the opinion in that case, and as confirming the view taken of that case by Tiedeman, we quote: "We consider that the State has the same right to forbid and punish the manufacture of counterfeit butter that it has to forbid and punish the manufacture of *counterfeit coin.* The like view was taken by us of the validity of the Act of 1881, in relation to the manufacture or sale of *imitation butter* (State v. Addington, 77 Mo. 110), though the latter act contained no such provisions as are contained in section 8 of the present act."

It will be observed that the court dwells in both cases upon the fact that in both acts "the evident object and dominating idea was to prevent the manufacture or sale of a spurious article of butter," and upon this ground we still have no hesitancy in holding that such legislation is clearly valid.

Such, also, was the ruling in People v. Arensberg, 105 N. Y. 123, in which the act was entitled "An Act to prevent deception in the sale of dairy products," and it was forbidden to sell any article "in imitation or *semblance* or designed to take the place of natural butter."

In State v. Marx, 99 N. Y. 377, the Court of Appeals held an act of the Legislature invalid which made the manufacture out of any oleaginous substance or compound other

State v. Layton.

than that produced from unadulterated milk and cream, any article *designed to take the place of butter, etc.* Judge RAPALLO in the course of the opinion, after stating that the evidence disclosed that oleomargarine was a perfectly healthful and pure article of food, says: "One of the learned judges who delivered opinions at the general term endeavored to sustain the act on the ground that it was intended to prohibit the sale of any artificial compound, as genuine butter or cheese made from unadulterated milk or cream. That it was the *design* to *deceive* which the law rendered criminal. If that were a correct interpretation of the act, we should concur with the learned judge in his conclusion as to its validity, but we could not concur in his further view that such an offense was charged in the indictment, or proved on the trial. The prohibiton is not of the manufacture or sale of an article designed as an *imitation* of dairy butter or cheese, or intended to be passed off as such, but of an article designed to *take the place* of dairy butter or cheese. Simulation of butter is not the act prohibited."

Again the court says: "It appears to us quite clear that the object and effect of the enactment were not to supplement existing provisions against fraud and deception by means of imitations of dairy butter, but to take a further and bolder step, and by absolutely prohibiting the manufacture or sale of any article which could be used as a substitute for it, however openly and fairly the character of the substitute might be avowed and published, to drive the substituted article from the market, and protect those engaged in the manufacture of dairy products, against the competition of cheaper substances, capable of being applied to the same uses, as articles of food." The court then asks the question, "Who will have the temerity to say that these constitutional principles are not violated by an enactment which *absolutely prohibits* an important branch

of industry for the sole reason that it competes with another, and may reduce the price of an article of food for the human race ?" The court held that statute unconstitutional.

Judge DILLON in his admirable work on Municipal Corporations (4 Ed.), sec. 141, p. 211, in a note to the text says: "We can not refrain from expressing our full concurrence in the views and conclusions of the Court of Appeals of New York in People v. Marx........The Pennsylvania Act of 1885, under which Powell was convicted (Powell v. Com., 114 Pa. St. 265, and affirmed in 127 U. S. 678) makes the manufacture and sale of oleomargarine though open and unconcealed, a crime. We can not but express our regret that the Constitution of any of the States or that of the United States admits of a construction that it is competent for a State Legislature to suppress (instead of regulating) under fine and imprisonment, the business of manufacturing and selling a harmless and even wholesome article, if the Legislature chooses to affirm, contrary to the fact, that the public health or public policy requires such suppression. The record of the conviction of Powell for selling, without any deception, a healthful and nutritious article of food *makes one's blood tingle.*"

At first blush the decisions in the Marx and Addington cases may appear to collide, but upon a closer view it will be seen that the Court of Appeals distinctly assents to the doctrine upon which Judge SHERWOOD announces the Addington case rests; for, speaking of the effort to sustain the New York statute on the ground "that it was intended to prohibit the sale of any artificial compound as genuine butter or cheese made from unadulterated milk or cream, that it was that *design to deceive* which the law rendered criminal," Judge RAPALLO says, "*If that were a correct interpretation of the act,* we should concur as to its validity."

As the oleomargarine act considered in the Addington case prohibited *imitation* butter, and as this court held it was valid because it shut the door against the designs to perpetrate fraud, the great underlying principle of both cases was the same though the two courts might differ as to the meaning of the words of the two acts.

Does the Act of May 11, making it penal to use alum in the preparation of baking powders, bring it within the reason of State v. Addington ?  In the Addington case there was a recognized standard for the article which the Legislature intended to protect against fraudulent imitation, to-wit, natural butter made from pure dairy products or unadulterated milk, and in accordance with our decision in that case we held that statutes enacted to prevent the imposition of a deception upon others are clearly valid.   [Cook v. The State, 110 Ala. 40; Stotlz v. Thompson, 44 Minn. 271; State v. Marshall, 64 N. H. 549; State v. Newton, 50 N. J. L. 534; Com. v. Huntley, 156 Mass. 236; State v. Horgan, 56 Minn. 183.]

But the question raised on this record, while a kindred one, is, we conceive, different.  It seems to us that in the nature of things there is a wide difference between legislation prohibiting or regulating the manufacture and sale of an article which is manufactured with a design to imitate a standard or superior article, and pass it off on the public, which can not readily detect the imposition, for something different from what it is, and the manufacture and sale of an article which in truth and fact is admitted to be innocuous and healthful, and in general use, and about which there is neither *secrecy,* or *imitation* of another article of conceded purity and wholesomeness.

The Addington and similar cases settle the constitutionality of the former, but do not reach the latter.   As the case

at bar does not fall within the reasoning and purview of the Addington case, that case does not reach the difficulty here. The statute upon which this prosecution is based is not based upon the idea of imitation of one article by another.

No baking powder is recognized as the standard, as is butter from unadulterated milk in the oleomargarine statute. Here the statute must be upheld, if at all, upon the right of the Legislature to make all needful laws to preserve the public health.

The right of the State to protect the health, morals and safety of its people by regulations that do not interfere with the execution of the powers of the general government or violate rights secured by the Constitution of the United States is now recognized by all courts in this country.

It is peculiarly a legislative function. While it is true that there are limits under our system to this power, we must start with the presumption in favor of the act. While we do not accede to the proposition that the Legislature can arbitrarily declare any article of food in general use, and concededly wholesome and innocuous, to be *unhealthy*, and its producttion and sale, a crime and would have no hesitancy in declaring such an act void, when the act on its face disclosed its arbitrary and unreasonable character, or where as in the Marx case, 99 N. Y. 377, when such an act is challenged on such ground it is admitted by the State that the prohibited article is innocuous and beneficial in itself and is not made in imitation of or with a view to deceive the public, but is made and vended without secrecy and without imitation of any other and the only purpose of the law is to prevent competition; still, we find ourselves confronted in this case with a state of facts essentially different from that presented to the court in the Marx case.

While defendant offered much evidence to show that

alum baking powders were a useful and harmless preparation, there is no gainsaying the fact that the State offered much pertinent testimony of the contrary. That there has long existed a strong prejudice against the use of alum in the making of bread must be conceded. Whether or not the prejudice is well founded, is another matter.

As early as the thirty-seventh year of the reign of George the Third, the British Parliament absolutely prohibited the use of alum in the making of bread. [Stat. 37 Geo. 3, ch. 98, sec. 21.] And irrespective of the statute it was held indictable to use it in large quantities. [Rex v. Dixon, 4 Camp. 12.] Such seems still to be the statute law of England. [Bread Act, 1836; 1 Chitty's Eng. Stats., Title, "Bread" and "Adulteration of Foods."]

Several States of our Union, while not going to the extreme of our General Assembly, have statutes passed with a view to the protection of the public against these alum powders by requiring that the cans in which they are sold shall give notice that they contain alum, and these acts have been sustained as fairly within the police power of the State. This court, in view of this sharp conflict of testimony as to the noxious or innocuous character of alum baking powders, can not take judicial notice that these powders are a perfectly innocuous preparation.

Under these circumstances, then, are we to hold that the court of criminal correction erred in not passing upon the question of fact tendered to him and having found the fact, in not deciding the law, constitutional or unconstitutional accordingly as it appeared to him to be harmful and deleterious or harmless and innoxious? "If so," as was said in People v. Cipperly, 101 N. Y. 634, affirming 37 Hun. 324, by the Court of Appeals of New York, the same court which decided the People v. Marx, 99 N. Y. 377, "the court must

Vol 160 mo—32

charge the jury, in each case, that if they find milk below that standard to be unwholesome, then the statute is constitutional; if they find it to be unwholesome, then the statute is unconstitutional.   Evidently a constitutional question can not be settled, or rather unsettled, in that way.   The constitutionality would vary with the varying judgments of juries."   Substitute alum baking powders for milk, and we have the rule applicable to this case.

Long before the decision of the Court of Appeals in that case, however, Judge LEONARD of this court, in State v. Rich, 20 Mo. 396, had said:   "If, whenever any act done under the authority of the law came in question collaterally, the constitutionality of the law could be contested, then the trial of the main issue must necessarily be delayed until the preliminary fact, upon which the validity of the contested legislative act depended, should be first tried and determined upon testimony, which, being different in different cases, might involve the absurdity of deciding the law constitutional one day and unconstitutional the next."   And he held the evidence inadmissble.

What, then, is the test when the constitutionality of an act of the Legislature is assailed as invading the right of the citizen to use his faculties in the production of an article for sale for food or drink?   We answer that if it be an article so universally conceded to be wholesome and innocuous that the court may take judicial notice of it, the Legislature under the Constitution has no right to absolutely prohibit it; but if there is a dispute as to the fact of its wholesomeness for food or drink, then the Legislature can either regulate or prohibit it.   The constitutionality of the law is not to be determined upon the question of fact in each case, but the courts determine for themselves upon the fundamental principles of our Constitution, which vests the legislative power in the General

Assembly, and the rule of construction adopted by our courts "that an act of the Legislature is not to be declared void, unless the violation of the Constitution is so manifest as to leave no room for reasonable doubt." [Com. v. Smith, 4 Bin. (Penn.) 117; Cooley, Const. Lim. (6 Ed.), p. 216; State v. Nelson, 39 N. E. 22]

The cases abound, in the greatest courts, State and Federal, in which this limitation has been set upon their own authority by the greatest judges who have illumined our jurisprudence. [Ogden v. Saunders, 12 Wheat. 213; Sinking Fund Cases, 99 U. S. 700; In re Wellington et al., 16 Pick. 87; Perry v. Keene, 56 N. H. 514.]

In this last case LADD, J., said: "Certainly it is not for this court to shrink from the discharge of a constitutional duty; but at the same time, it is not for this branch of the government to set an example of encroachment upon the province of the others. It is only the enunciation of a rule that is now elementary in the American States to say that before we can declare this law unconstitutional we must be fully satisfied —satisfied beyond a reasonable doubt—that the purpose for which the tax is authorized is private and not public."

Keeping in view this cardinal principle for our guidance, how can we say, in view of the contradictory evidence as to the effect on the health of bread made with alum baking powders, that the Legislature, beyond a reasonable doubt, transcended its constitutional right in prohibiting the use of alum in bread? We are not authorized to do so.

It may be argued with great force that a statute similar to the Minnesota statute would be sufficient for the protection of purchasers who have a prejudice against these powders; it may be that in the small quantities now used in these alum powders generally it can not be shown that any particular person has ever lost his health from their use, but that the

Legislature deemed their use deleterious can not be denied, and there is no such conclusive evidence to the contrary as to justify this court in holding that this act, intended for the benefit of the public health, is void. The mere wisdom or unwisdom of the act, is not for us to decide.

The judgment must be and is affirmed.

*Sherwood, P. J.,* and *Burgess, J.,* concur.